**STATE**

v.

**Christopher S. THORNTON.**

**Nos. 99–376–C.A., 98–263–C.A.**

Supreme Court of Rhode Island.

June 27, 2002.

Aaron L. Weisman, Lauren Sandler Zurier, for Plaintiff.

Catherine A. Gibran, Paula Rosin, for Defendant.

Present: LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

In these consolidated appeals, the defendant, Christopher S. Thornton, first challenges his convictions by a Superior Court trial jury for kidnapping, domestic felony assaults, intimidation of a witness, and violation of a previous no-contact order. He also appeals from the denial of his post-trial motion to reduce the sentences that were imposed following his convictions.

## Facts and Travel

For some six years prior to June 1996, Debra Means (Debra) and Christopher S. Thornton (defendant or Thornton) had been engaged in a relationship from which in 1994, a daughter, Amy,[1] was born. Debra had another son, Adam,[2] from an earlier relationship who was seven years old. The defendant, Debra, and the two children lived together in an apartment on Rockland Street in the town of Narragansett.

The relationship between the defendant and Debra was described as having been a tumultuous one, during which he had beaten her. Shortly before June 3, 1996, Debra broke off the relationship, and because of her fear of the defendant, she obtained a no-contact order against him. The no-contact order prevented the defendant from contacting Debra, but permitted him to visit his daughter, Amy.

On the afternoon of June 18, 1996, while Debra was preparing to leave for her employment at a health center in East Providence, her daughter, Amy, was in the living room watching television and waiting for Debra to drive her to her baby-sitter's home. The defendant unexpectedly walked into the apartment, came up to Debra and said, "I've got something for you in my back pocket." Debra touched his back pocket and felt the handle of a knife with a blade at least ten inches long. The defendant then pulled a telephone from the wall and pulled Debra into Adam's bedroom. When Debra told the defendant' that she was on her way to work, he sharply replied, "You are not going to work. You are going to die." The defendant then directed Debra to telephone her employer and tell him that her car would not start and that she would not be coming to work. The defendant held the knife to her throat while she made the telephone call. Debra then called for Amy, but the defendant told her not to call Amy into the room, threatening to "take her out, too" if she came into the room.

A short time later, Diane Sullivan (Diane), Amy's baby-sitter, telephoned Debra to find out why she had not brought Amy over to her home, where she baby-sat the child. Debra told Diane that she was not going to work, and Diane, sensing something was wrong, asked Debra whether the defendant was there, and Debra said yes. Because Diane was aware of the no-contact order and Debra's fear of the defendant, she telephoned the Narragansett police to alert them of what might be happening.[3]

---

1. This is not the child's real name.

2. This is not the child's real name.

3. Diane telephoned Debra three or four times. On one occasion she spoke with the defendant, who warned Diane "that if he got in trouble and he had to go to jail" because of

the testimony that Diane planned to give in an upcoming court proceeding "that there would be a letter out for me," and that he was going to kill her. After this threat Diane called the police again. This threat formed the basis for the defendant's charge for witness intimidation.

Apparently sensing what had been said between Debra and Diane, the defendant became enraged and punched Debra in the face, knocking out her front teeth as Amy watched in horror.[4] Within minutes, Debra was able to observe that the police were arriving, and she screamed out for help. At this, the defendant grabbed her by the hair, put his knife to her throat, and again threatened to kill her. The arrival of the police then triggered what would turn out to be a fourteen-hour-long confrontation-standoff between the defendant and the police, with the defendant holding Debra hostage and repeatedly threatening to kill her. The standoff lasted from mid-afternoon on June 18, 1996 through the early morning hours of the next day.[5] During that time, the defendant repeatedly dragged Debra to the window in full view of the police, where he either would hold her by the hair with his knife to her throat or with his arm around her with his knife to her back. Debra made at least ten unsuccessful attempts to escape from the defendant, and after each attempt the defendant punched her in the face. During the standoff, the defendant also stabbed Debra four times, twice in the side, once in the back, and once in the arm.

Throughout the long standoff, the Narragansett police had extensive interaction with the defendant in an attempt to negotiate Debra's release, but he repeatedly refused to release her. Later, he began demanding complete amnesty from prosecution in return for releasing Debra, which demands were rejected. Finally, in the early hours of June 19, about twelve hours into the standoff, the police concluded that the defendant would not release Debra, or surrender, so they called in the South Kingstown Emergency Services Unit (a police SWAT team) for assistance. Shortly after the SWAT team arrived, at about 4:30 a.m., it stormed the apartment and subdued the defendant. Debra was immediately taken to a local hospital for extensive medical treatment.[6]

On September 23, 1996, a Washington County grand jury indicted the defendant, charging him with ten offenses stemming from the June 18-19, 1996 incident at Debra's apartment. He was charged with first-degree sexual assault of Debra (count 1); assault with a dangerous weapon in a dwelling (count 2); felony assault with a dangerous weapon (count 3); assault with intent to murder Debra (count 4); felony assault resulting in serious bodily injury (count 5); breaking and entering a dwelling without consent of Debra (count 6); violation of a no-contact order (count 7); kidnapping Debra (count 8); intimidating a witness (Diane Sullivan) (count 9); and kidnapping Amy (count 10). The defendant was arraigned on September 25, 1996, pled not guilty to all charges, and was referred to the Public Defender's office for determination of his eligibility for the Public Defender's services.[7]

The defendant's trial before a Washington County Superior Court jury took place on December 2-5, 1997. On December 8, the trial jury returned its verdicts on the

---

4. Debra retrieved her teeth in hopes that they could be reimplanted, but because of the duration of her kidnapping the teeth deteriorated beyond salvage. Ultimately, she required oral surgery and permanent bridgework.

5. Fortunately, Debra and the police, after repeated entreaties, were able to persuade the defendant to release Amy on June 18 at about 4 p.m.

6. One of the stab wounds punctured a muscle near Debra's diaphragm and required major surgery to properly close the wound.

7. An assistant public defender was present to assist the defendant at his arraignment.

nine charges that had been submitted to it.[8] The jury found the defendant guilty on count 3 (felony assault with a dangerous weapon); count 5 (felony assault resulting in serious bodily injury); count 7 (violation of a no-contact order); count 8 (kidnapping Debra); and count 9 (intimidating a witness (Diane Sullivan)). He was found not guilty on count 1 (first-degree sexual assault of Debra); count 2 (assault with a dangerous weapon in a dwelling); count 4 (assault with intent to murder Debra); and count 10 (kidnapping Amy).

After sentences were imposed, the defendant timely appealed.

In his appeal, the defendant asserts (1) that the trial justice erred in permitting him to waive his right to counsel without first determining whether such waiver was knowing and intelligent; (2) that the trial justice unduly impaired his right of self-representation; (3) that the trial justice erred in precluding admission of defense evidence that allegedly would have supported his diminished capacity defense; and (4) that the trial justice erred in permitting introduction of past incidents of misconduct by the defendant during the prosecutor's cross-examination of defense expert Dr. Ronald Stewart (Dr. Stewart). Also before us is the defendant's consolidated appeal from the denial of his post-trial motion to reduce his sentences. These issues will be dealt with in their order of significance to this opinion. Additional facts will be noted as needed.

## Analysis

### I

### Waiver of Counsel

After rejecting representation by three court-appointed attorneys before trial, Thornton elected to represent himself *pro se* at trial with court-appointed standby counsel. On appeal he concedes that he had waived his right to counsel voluntarily but argues that his waiver violated his Sixth Amendment right to counsel because it was not made knowingly and intelligently, and the trial justice failed to make any finding that it was in fact so waived.

The record before us discloses that Thornton was arraigned on September 25, 1996, and he was referred to the Public Defender's office to determine his eligibility for its services. He was found to be eligible, and Assistant Public Defender Richard Brousseau (Brousseau) was assigned to represent Thornton. Less than a month later, during a preliminary hearing on October 18, 1996, Thornton moved to dismiss Brousseau, asserting that he did not feel "comfortable" with Brousseau's representation. He failed to outline his specific concerns regarding Brousseau's representation but requested that he be assigned either another assistant public defender or be provided private counsel. The hearing justice deferred the pretrial proceedings and ordered Thornton to discuss his specific concerns with Brousseau to determine whether his concerns could be remedied.

Some five weeks later, on November 25, 1996, Thornton again appeared before the hearing justice and requested Brousseau's removal, stating that differences of opinion existed between himself and Brousseau that affected the attorney-client relationship. Given Thornton's complaints, Brousseau requested to be permitted to withdraw as Thornton's counsel, and the hearing justice permitted his withdrawal.

---

**8.** At the close of the state's case in chief, the trial justice granted the defendant's motion for judgment of acquittal on count 6, which had charged the defendant with breaking and entering a dwelling without the consent of the owner. Thus only nine of the ten indictment charges were submitted to the trial jury.

The hearing justice at that time, apparently sensing that Thornton appeared to have initiated a course intended to delay his trial, warned Thornton that she would not allow "differences of opinion" with his next court-appointed counsel, standing alone, to justify removal of that attorney.

Attorney William O'Connell (O'Connell) subsequently was appointed to represent Thornton, and on December 2, 1996, he entered his appearance on Thornton's behalf. O'Connell's tenure was not much longer than Brousseau's. In March 1997, Thornton motioned to have O'Connell removed because O'Connell had declined to handle a then-pending appeal by Thornton from an earlier probation-violation finding, a matter that later was resolved when Thornton agreed to have an assistant public defender represent him on that appeal. Five months later, however, in late August 1997, some three weeks prior to his scheduled trial date, Thornton once again moved to dismiss O'Connell as his attorney, asserting now that he had recently filed a disciplinary complaint against O'Connell claiming that O'Connell had failed to keep him informed about his case and that O'Connell was not devoting enough time to his case. The hearing justice again reminded Thornton that he was entitled to counsel, but not necessarily counsel of his choice, and that she had previously cautioned him that O'Connell would be his last court-appointed attorney. Despite her continued suspicion that Thornton was attempting to delay the start of his trial, a suspicion prompted by Thornton's moving

on "the eve of trial" to remove O'Connell, the hearing justice permitted O'Connell to withdraw, particularly because of the disciplinary complaint that had been filed against him by Thornton, which she believed created a conflict of interest in his continued representation of Thornton.[9] She refused, however, to appoint new counsel for Thornton, and advised Thornton that it was now up to him to retain private counsel or to proceed *pro se.* Thornton objected to the hearing justice's action and told her:

"[W]e already know I'm not an attorney, first of all. Second of all, I'm driving blind here because we haven't discussed any type of defense. So if we want to proceed with this, fine. I don't know what I'm going to do, and I don't even know what I'm going to say, but I made my argument and also presented to the court. * * * You're asking me to come in here, represent myself for something we already both know I cannot do. * * * But I can surely guarantee you one thing, we both know I don't know what I'm going to be doing to represent myself. So I would find that your argument and your grounds for that is a violation based on the fact that I cannot represent myself."

On September 8, 1997, Thornton appeared before a different Superior Court justice to whom the case had been assigned for trial to determine whether he had retained counsel or whether he was going to proceed *pro se.* He once again objected to the options previously present-

---

9. *The hearing justice noted:*

"This case is on the eve of trial. A trial date has been assigned as to a date certain for over a month. The date certain for trial is scheduled for Monday, September 8. And I do not believe that is coincidence. Your motion to release Mr. O'Connell was filed on August 20, approximately two weeks before the date certain for trial. The

concerns that you have about Mr. O'Connell and his representation, in fact, relate back to the proceedings of February and early March of this year. They are presumably complaints which you have had all along since that time. Yet, you have waited until the eve of trial to file your motion seeking to relieve him as counsel in this case."

ed to him by the earlier hearing justice. Thornton explained that he understood he had a right to counsel but was "uncomfortable with putting my life in any hands—in [O'Connell's] hands or a standby counsel's hands" and would rather represent himself "even if it means having a fool for a client." Thornton then requested additional time to prepare his defense and to make *pro se* objections to the validity of the indictment pursuant to Rule 6 of the Superior Court Rules of Criminal Procedure; to file a discovery objection pursuant to Rule 16(a); and to request certain transcripts of previous witness testimony under Rule 26.1.

The trial justice again presented Thornton the option of his either appearing *pro se* with standby counsel or agreeing to be represented by O'Connell after "making his peace" with O'Connell. Asserting that he was being "forced" to appear *pro se*, Thornton nonetheless agreed to the appointment of standby counsel, and the trial date then was continued until December 2, 1997. Attorney Anthony Amalfetano (Amalfetano), a seasoned and experienced criminal defense attorney, was appointed shortly thereafter to serve as standby counsel. Amalfetano proceeded to review the various motions Thornton had filed and also moved for permission to engage a medical expert with expertise in diminished capacity defenses and an investigator to assist the defense. On October 23, 1997, Amalfetano's motion to engage a medical expert and investigator was granted, and the trial justice asked Thornton to consider whether he wanted Amalfetano to represent him at trial and gave him several weeks to make a decision. At a pretrial hearing on November 14, 1997, Thornton now moved to dismiss Amalfetano as his standby counsel, contending that Amalfetano was not competent in "this area of law," apparently referring to his already decided upon diminished capacity defense. The trial justice refused Thornton's request to have "competent counsel in this area of law that I base my defense on" appointed to represent him.

On November 26, 1997, less than a week before his second scheduled trial, Thornton finally agreed to accept Amalfetano as his attorney, but only on condition that Thornton be given "at least a ninety day continuance to a six months continuance based on the fact that he would have to explore, research, speak with witnesses, talk with anybody that would come to mind." The trial justice denied Thornton's motion for a continuance, explaining to Thornton that he had in fact chosen to represent himself *pro se* by three times rejecting the services of competent counsel who had previously been appointed to represent him. The trial justice considered Thornton's actions to be another trial-delay tactic, and refused to grant Thornton's request for up to a six-month trial continuance. On December 2, 1997, Thornton proceeded to trial *pro se* with Amalfetano as standby counsel.

During the course of the four-day trial, extending from December 2 through December 5, 1997, the record discloses that the trial justice was overly solicitous of Thornton's *pro se* status. He took great care when necessary to explain in detail various points of law to Thornton, entertained defense motions out of time, and encouraged Thornton to rely on standby counsel's advice as much as possible.[10] He also allowed standby counsel to assist in the jury *voir dire*, to examine and cross-

---

10. Indeed, Thornton's appellate counsel, who we are certain scrupulously reviewed the trial record, concedes that "[i]n many ways, the trial justice was a model of patience and accommodation and generally bent over backwards to enable Mr. Thornton to present his defense *in propria persona*."

examine witnesses, introduce exhibits, to file motions and to make legal argument on Thornton's behalf, all as directed by Thornton, and to assist Thornton with preparing requested jury instructions.

The trial record discloses to us that Thornton, in addition to cleverly using his repeated ingratiating reminders to the jury during trial about his *pro se* status, more than adeptly managed to conduct his defense. He filed numerous pretrial motions, delivered an impassioned opening statement and closing argument, artfully examined or cross-examined the various trial witnesses, and interposed numerous evidentiary objections, which for the most part were sustained by the trial justice. He successfully moved during trial for judgment of acquittal on the charge against him of breaking and entering, and later was able to persuade the trial jury to acquit him of the charges of first-degree sexual assault, assault with a dangerous weapon in a dwelling house, assault with intent to murder, and of kidnapping his daughter. The trial justice specifically noted that Thornton had "represented [himself] quite effectively at the trial." Additionally, we note from the trial record that Thornton was able to cleverly manage and handle with unusual acuity his post-trial proceedings. At the time of sentencing, for example, he was quite eloquent in the course of exercising his right of allocution, and the perceptive argument he presented at a later hearing on his motion to reduce his sentences was equal to that of any experienced criminal defense attorney.

Thornton initially contends here on appeal that the trial justice erred in failing to expressly advise him of the dangers of representing himself *pro se* at his trial before permitting him to do so. Thornton concedes that his waiver of counsel was voluntary, but because he claims to never have been specifically advised of the dangers of representing himself, his waiver was not a knowing and intelligent waiver on his part and that all of his convictions therefore must be reversed. However, a detailed review of the totality of the circumstances reveals that Thornton was well aware of the dangers of representing himself and chose to represent himself *pro se* with his "eyes open." *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562, 582 (1975).

In considering whether Thornton's waiver of counsel was validly made in this case, this Court employs a two-prong analysis to determine first, whether the waiver was "voluntary", and second, whether the waiver was "knowing and intelligent." *State v. Briggs*, 787 A.2d 479, 486 (R.I.2001) (citing *State v. Chabot*, 682 A.2d 1377, 1380 (R.I.1996) (per curiam)).

It is generally acknowledged that absent any showing of "good cause" for a defendant's refusal to accept court-appointed counsel, such refusal is functionally equivalent to a voluntary waiver of the right to counsel. *See, e.g., Dunn v. Johnson*, 162 F.3d 302, 307 (5th Cir.1998), *cert. denied*, 526 U.S. 1092, 119 S.Ct. 1507, 143 L.Ed.2d 659 (1999); *United States v. Patterson*, 140 F.3d 767, 776 (8th Cir.1998); *McKee v. Harris*, 649 F.2d 927, 930–31 (2d Cir.1981); *State v. Craig*, 274 Mont. 140, 906 P.2d 683, 690 (1995). *Accord State v. Desroches*, 110 R.I. 497, 505, 293 A.2d 913, 918 (1972). In this case, three different, capable, experienced court-appointed defense attorneys had been rejected by Thornton—all without good reason being shown for their rejection.[11] He concedes that his decision to proceed *pro se* was

---

11. The dissent contends that Thornton had rejected the assistance of only two attorneys to represent him at trial. The case record establishes otherwise. *Three* attorneys had been appointed by the court. Assistant Public Defender Richard Brousseau was assigned to

constitutionally voluntary. Accordingly, we believe that he voluntarily waived his right to a fourth court-appointed counsel. The options offered to him—accepting the services of previously appointed counsel, hiring private counsel, or proceeding *pro se* with standby counsel—all met constitutional muster. Thornton's repeated refusal to accept the services of competent court-appointed defense counsel demonstrates clearly the voluntary waiver of his right to counsel, and that he was not in any way unconstitutionally "forced" to proceed *pro se*. *See, e.g., United States v. Padilla*, 819 F.2d 952, 956 (10th Cir.1987).

Having conceded that his waiver of counsel was voluntary, Thornton however asserts that it was not a knowing and intelligent waiver. As with other constitu-

tional questions, this Court reviews such a determination *de novo*, giving deference to the lower court's findings of historical fact. *Simpson v. State*, 769 A.2d 1257, 1265–66 (R.I.2001). Thornton specifically asserts here that his waiver must be deemed to have been invalid because the trial justice failed to conduct a *Faretta* inquiry and did not expressly advise him of the dangers of self-representation before Thornton proceeded *pro se*. The "absence of explicit bench warnings or a colloquy on the record" mandates no such conclusion. *Maynard v. Meachum*, 545 F.2d 273, 277 (1st Cir.1976).[12] This Court has recently held in a unanimous opinion, in which the dissenting justice himself had joined, that a *Faretta* colloquy, while preferable, is not constitutionally required.

represent Thornton on September 25, 1996. After the motion justice permitted Brousseau to withdraw, William O'Connell was appointed to represent Thornton and made his first appearance on December 2, 1996. Thornton tried to have O'Connell removed in March 1997 and again in August 1997. Thornton agreed to the appointment of standby counsel on September 8, 1997, and the trial date was continued. Anthony Amalfetano then was appointed as standby counsel. As noted in the majority opinion, at a pretrial hearing on October 23, 1997, the pretrial hearing justice asked Thornton to consider whether he wanted Amalfetano to represent him as trial counsel at trial and gave him several weeks to make a decision. At a later hearing, on November 14, 1997, Thornton himself, despite at that time referring to Attorney Amalfetano as being his "co-counsel," conceded that he had rejected the services of Amalfetano because he did not think Amalfetano was competent in "this area of the law" (diminished capacity defenses).

12. The dissent contends that our reliance upon the First Circuit's holding in *Maynard v. Meachum*, 545 F.2d 273 (1st Cir.1976), is misplaced because "the First Circuit itself has called into doubt the *Maynard* holding that no colloquy on the record is necessary," citing to the First Circuit's 1982 holding in *United States v. Harlan*, 696 F.2d 5, 7 (1st Cir.1982).

We read *United States v. Harlan* much differently than does the dissent. We find nothing in *Harlan* that calls into doubt its earlier *Maynard* holding that no colloquy on the record is necessary. We note further that in *Harlan*, the colloquy about which the Circuit Court said, "[a] one minute dialogue should have taken care of the whole matter," *id.* at 7, concerned whether the trial judge after being informed by the U.S. Attorney that the defendant was proceeding *pro se* because he was indigent, erred in failing to ask the defendant whether he was indigent and if so, then advising him that he was entitled to court-appointed counsel. That colloquy is a far cry from what is concerned in Thornton's appeal.

We finally note that in the twenty years since *Harlan* was decided, the First Circuit never has cited to it, nor called into doubt *Maynard's* "no colloquy required" holding. In fact, the *Maynard* holding has been expressly *reaffirmed*. *See United States v. LaBare*, 191 F.3d 60, 68 (1st Cir.1999); *United States v. Kneeland*, 148 F.3d 6, 12 (1st Cir. 1998); *United States v. Benefield*, 942 F.2d 60, 65 (1st Cir.1991); *United States v. Campbell*, 874 F.2d 838, 845–46 (1st Cir.1989). *See also United States v. Woodard*, 291 F.3d 95 (1st Cir.2002), in which *LaBare, Kneeland,* and *Benefield* are cited with approval and in which the rule espoused in *Maynard* is not contradicted.

In *State v. Spencer,* 783 A.2d 413, 416–17 (R.I.2001), we held:

"Although the simplest method to determine whether a waiver of counsel is knowing or voluntary may be a detailed colloquy between the trial court and the defendant, such an inquiry is not constitutionally required. * * * In fact, the [United States] Supreme Court has indicated that the inquiry 'must be pragmatic and directed to the "particular stage of the proceedings in question." ' * * * We are persuaded that an examination of the totality of the circumstances, in light of the particular stage of the proceedings at the time the waiver is proposed, is the better approach to determine whether a waiver of counsel is knowing, voluntary and intelligent."

In assessing the validity of a defendant's waiver of counsel when competence is not an issue, this Court recommends, but does not require, that trial justices consider the six factors discussed in *Chabot,* 682 A.2d at 1380, namely:

"(1) the background, the experience, and the conduct of the defendant at the hearing, including his age, his education, and his physical and mental health; (2) the extent to which the defendant has had prior contact with lawyers before the hearing; (3) the defendant's knowledge of the nature of the proceeding and the sentence that may potentially be [ ] imposed; (4) the question of whether standby counsel has been appointed and the extent to which he or she has aided the defendant before or at the hearing; (5) the question of whether the waiver of counsel was the result of mistreatment or coercion; and (6) the question of whether the defendant is trying to manipulate the events of the hearing." *Briggs,* 787 A.2d at 486 (quoting *Chabot,* 682 A.2d at 1380).

■ In this case, an explicit colloquy between the trial justice and Thornton did not take place. However, the trial justice's failure to conduct such a colloquy does not defeat a finding that the defendant's waiver of counsel was a knowing and intelligent waiver when other evidence in the record clearly supports that conclusion. *See, e.g., United States v. Goad,* 44 F.3d 580, 588–89 (7th Cir.1995); *United States v. Fant,* 890 F.2d 408, 409–10 (11th Cir.1989); *State v. Harmon,* 575 N.W.2d 635, 642 (N.D.1997). Our analysis of the six *Chabot* factors, we believe, confirms our conclusion that Thornton knowingly and intelligently waived his right to counsel. We take up consideration of those factors.

### Defendant's Background, Experience, and Conduct

■ Thornton's conduct at pretrial hearings demonstrates that he understood the dangers of self-representation. At one such hearing he told the pretrial hearing justice:

"I am not an attorney, your Honor. However, I do know and understand that I have a basic fundamental right to legal representation in this forum. I feel, however, that by not being provided to me at this time, that I could see myself being—I can see myself being uncomfortable with putting my life in any hands—in his hands or a standby counsel's hands—at this time, okay, to represent myself, then I could choose the latter, even if it means having a fool for a client."

At a later pretrial hearing, Thornton again related to the pretrial hearing justice:

"I do not have the knowledge or skills to represent myself because I do not understand if the indictment is good or bad, and I am unfamiliar with the Rules

of Evidence, your Honor. Without the aid of counsel, I may be put on trial without a proper charge or conviction, upon incompetent evidence, or otherwise inadmissible. Your Honor, I lack both the skill and knowledge to adequately prepare my defense. I need the guiding hand of counsel at every step in the proceedings against me."

"What I need from you, your Honor, is for you to assign counsel so I will become—so I will not become a victim of overzealous prosecution."

Thornton further related to the pretrial hearing justice that representing himself meant "not having access to people to be able to interview him, not having access to the law library," and that he was not qualified to represent himself. Such remarks certainly reflect a defendant's awareness of the disadvantages of self-representation. See, e.g., United States v. Sandles, 23 F.3d 1121, 1124 (7th Cir.1994); Craig, 906 P.2d at 690. Throughout the pretrial proceedings in this case, Thornton made abundantly clear the fact that he recognized how an attorney would be of great assistance to him. For example, he acknowledged that an attorney would best know how to preserve objections for appeal; how to accomplish a change of venue for excessive publicity pursuant to Rule 21 of the Superior Court Rules of Criminal Procedure; and how to prepare and file motions. The defendant also reiterated to the court that "I will never concede * * * that I requested to be my own attorney. That will be, like I made the Court aware, I will be a fool for my own client."

Thornton, we note, was no newcomer to criminal procedures. His extensive previous criminal background demonstrated that he was well-acquainted with the criminal justice system and its procedures, and was completely aware of the importance of being represented by legal counsel. See, e.g., United States v. Moya–Gomez, 860 F.2d 706, 736 (7th Cir.1988); State v. Worthy, 583 N.W.2d 270, 276–77 (Minn.1998); State v. Crisafi, 128 N.J. 499, 608 A.2d 317, 325 (1992).

We note also from the record before us that just before trial, the trial justice repeatedly implored Thornton to accept the assistance of Amalfetano as trial counsel, but Thornton remained intransigent, apparently intending to be able to later capitalize on what he envisioned could be a built-in trial error which, if convicted, could serve to his advantage.[13]

Thornton's intelligence and clever street savvy, his repeated references to the dangers of self-representation, and the trial justice's observations regarding how well Thornton articulated his legal arguments, all tend to show that Thornton was perfectly competent to, and did, make a know-

**13.** The trial justice advised and warned the defendant:

"You are not a lawyer; you told me that. * * * I want you to consider whether you want Mr. Amalfetano, now that he's in the case as standby counsel, to slide over, if I can use that expression * * * I'm giving you that opportunity for many reasons, many of which we've just talked about. And you don't have to decide today about that, but I do, you know, want an answer from you as to how you feel about this when I see you on the 12th of November. Got it?

" * * * Now, as in sometime past, I've given you the occasion to allow standby counsel who is competent in criminal defense cases to slide over and be your counsel. Now you come before me and you want some unknown specialist in criminal law on a defense that I'm even unaware of. Absolutely no. Not appropriate, not relevant, not acceptable. We'll see you in December pro se with Mr. Amalfetano as standby counsel." (Emphasis added.)

ing and intelligent waiver of his right to have counsel's assistance during his trial.

### Extent to Which Defendant Had Previous Contact with Counsel

 As noted earlier, Thornton rejected the services of three different attorneys before electing to represent himself *pro se*. Each time, his rejection was based at least in part on differences of opinion about proposed trial strategy.[14] In the course of those disagreements, Thornton appears to have consulted with his previous attorneys about the nature of his case and potential defense strategies, in particular his alleged diminished capacity. Indeed, his rejection of Amalfetano was predicated entirely on his belief that he needed counsel more experienced in diminished capacity defenses, which certainly indicates that he must have discussed that defense with Amalfetano. It is reasonable to assume that Thornton's two former attorneys had also discussed with him the nature of the various indictment charges, trial preparation, and trial strategies, *State v. Gethers*, 197 Conn. 369, 497 A.2d 408, 415 (1985), and the benefits of legal representation, including the dangers of proceeding *pro se*. *State v. Jones*, 266 N.W.2d 706, 712 (Minn.1978). These factors militate in favor of a finding that his waiver of counsel was both a knowing and intelligent waiver. *See Spencer*, 783 A.2d at 417.

### Defendant's Knowledge of the Criminal Proceedings and Possible Sentences

 The record before us additionally contains numerous indications that Thorn-

ton clearly understood the nature of the criminal proceedings against him. He knew the number and nature of each count, including felonies that he considered so serious that he did not want to place "my life" in someone else's hands. Thornton clearly was also aware of his anticipated trial strategy, as evidenced by his insistence upon having counsel experienced in diminished capacity defenses, an indication of his familiarity with the nature of the specific-intent requirement underlying many of the charges levied against him. *See Moya–Gomez*, 860 F.2d at 733.

In his opening statement to the trial jury and as well during his cross-examination of the victim, Debra Means, he clearly exhibited not only his thorough knowledge and appreciation of the seriousness of the various charges against him, but also the trial strategy that he had chosen to convince the trial jury that on the day of the police standoff incident he was not his usual self, was suffering from the influence of prior drug use, and was devastated over his inability to visit his child, in short, a diminished capacity defense that he had cleverly planned on to absolve himself of any criminal responsibility for the various and brutal crimes for which he had been indicted.

We are satisfied, as was the trial justice, that Thornton was totally aware of the "magnitude of the undertaking" of self-representation and, as well, the dangers involved in representing himself at trial. *Maynard*, 545 F.2d at 279.

### Appointment and Participation of Standby Counsel

 The record also discloses that Amalfetano, as standby trial counsel, did pro-

---

14. The Sixth Amendment provides no right to counsel "who would blindly follow [a defendant's] instructions." *McQueen v. Blackburn*, 755 F.2d 1174, 1178 (5th Cir.1985), *cert. denied*, 474 U.S. 852, 106 S.Ct. 152, 88 L.Ed.2d 125 (1985). Nor is there any "absolute right to counsel of one's choice." *United States v. Peister*, 631 F.2d 658, 661 (10th Cir.1980), *cert. denied*, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981).

vide, when requested, diligent assistance to Thornton throughout the trial. He assisted Thornton in conducting the jury *voir dire*, with complicated procedural and evidentiary motions, with the direct examination of the defense's medical expert witness, and with strategic decisions such as whether to withdraw a witness from the defense witness list. The fact that standby counsel was available at all times during the trial to advise Thornton whenever he required assistance and that Thornton readily used standby counsel's services also supports the conclusion that Thornton's waiver of counsel was knowing and intelligent. *See Spencer,* 783 A.2d at 417.

### Whether Defendant's Choice Resulted from Mistreatment or Coercion

██ This factor in the analysis of whether the waiver of counsel was knowing and intelligent is not on the facts before us relevant because Thornton has conceded that his waiver was voluntary and not coerced. Other than Thornton's subjective belief that he was "forced" to represent himself, there is no evidence in the record indicating that his choice to do so resulted from any mistreatment or coercion. *See id.*

### Whether Defendant Tried to Manipulate Events of the Hearing

██ Evidence of a defendant's efforts to manipulate court proceedings against him may be gleaned from a defendant's request for new counsel on the eve of trial without good cause, *Goad,* 44 F.3d at 591; *People v. Arguello,* 772 P.2d 87, 94 (Colo.1989), or from a finding that his or her request was made for tactical reasons. *See, e.g., United States v. Bell,* 901 F.2d 574, 579 (7th Cir.1990).

The record here clearly demonstrates that both the pretrial hearing justice and the trial justice each believed that Thornton was attempting to delay the start of his trial. A perfect example of this was Thornton's last-minute refusal to be represented by Amalfetano based on his belief that Amalfetano was not experienced enough with diminished capacity defenses, which was followed by an about-face by Thornton when he realized that if he accepted Amalfetano's representation on the eve of trial, that maneuver might further delay the trial by three to six months.

We accord great deference to the trial justice's factual determination that Thornton's requests for new counsel had been strategically motivated to manipulate and delay the start of his trial, and it is reasonable for us to weigh the manipulative intent factor heavily against Thornton.[15] *See, e.g., Sandles,* 23 F.3d at 1129. We also are able to glean from the pretrial motion filings by Thornton in this case that he appears to have cleverly initiated and carefully maneuvered a pretrial strategy for himself that was geared to not only delay the start of his trial, but to also create a built-in pretrial denial of counsel issue that might later serve to rescue him from an unfavorable jury verdict or verdicts.[16] He apparently had learned well from his previous criminal experiences and his past trials which undoubtedly served to sharpen and hone his criminal litigation skills. His misfortune in this case, however, appears to have been his failure to maneuver his cunning strategy past two

---

**15.** In denying Thornton's request for a trial continuance, the trial justice informed Thornton that he was *convinced* "that if I had continued this case today for another year, it wouldn't make any difference. You'd be back with another request for an extension or another lawyer." (Emphasis added.)

**16.** Such a cunning stratagem is not unheard of. *See, e.g., Harlan,* 696 F.2d at 6.

seasoned and perceptive pretrial hearing justices, who quickly recognized that he was more the wily fox than the hapless defendant he was pretending to be.

We conclude from our *de novo* review of the record before us that there is ample evidence in that record to establish that Thornton voluntarily, knowingly, and intelligently waived his Sixth Amendment right to counsel, and contrary to the dissent's contention, no specific finding on the record by the trial justice to that effect was required. *United States v. Benefield,* 942 F.2d 60, 65 (1st Cir.1991); *United States v. Campbell,* 874 F.2d 838, 845 (1st Cir.1989). His appeal on this ground is denied and dismissed.

## II

### Defendant's Right of Self–Representation

Thornton's next allegation of error in this appeal is that notwithstanding his affirmative request for the assistance of standby counsel during his trial, standby counsel's representation of his interests at sidebar and in chambers conferences and standby counsel's approaching of witnesses in lieu of Thornton's doing so himself served to violate his Sixth Amendment right to counsel as outlined in *McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984).

In determining whether standby counsel violates a defendant's *Faretta* rights, the Court must focus on "whether the defendant had a fair chance to present his case in his own way." *Id.* at 177, 104 S.Ct. at 950, 79 L.Ed.2d at 132. When standby counsel participates in some aspect of a trial over a defendant's objection, the *Faretta* right imposes two limits on the extent of standby counsel's participation:

"First, the *pro se* defendant is entitled to preserve actual control over the case

he chooses to present to the jury. This is the core of the *Faretta* right. If standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak *instead* of the defendant on any matter of importance, the *Faretta* right is eroded."

"Second, participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself. * * * [T]he right to appear *pro se* exists to affirm the accused's individual dignity and autonomy. * * * From the jury's perspective, the message conveyed by the defense may depend as much on the messenger as on the message itself. From the defendant's own point of view, the right to appear *pro se* can lose much of its importance if only the lawyers in the courtroom know that the right is being exercised." *McKaskle,* 465 U.S. at 178–79, 104 S.Ct. at 951, 79 L.Ed.2d at 133–34.

The Supreme Court has also noted that if standby counsel participates at trial with the defendant's approval, such participation erodes both a subsequent claim that the defendant lacked control over his own defense and that he no longer appeared to the jury to be defending himself. *Id.* at 182–83, 104 S.Ct. at 953, 79 L.Ed.2d at 136. In this case, Thornton at times actually requested the trial justice to permit standby counsel to approach the bench and consult with the trial justice regarding defendant's objections made to the introduction of state trial exhibits.

### (a) Sidebar Conferences

Thornton next challenges the validity of his convictions by asserting that the trial

justice's ruling requiring that he be handcuffed when attending any sidebar bench conferences per se violated his Sixth Amendment right to counsel as set forth in *McKaskle*.[17]

We examine first the predicate facts leading to the trial justice's ruling requiring Thornton to be handcuffed when taking part in any sidebar bench conferences during the jury *voir dire* and later at trial. In doing so we note that the trial record fails to indicate whether in fact there had been any sidebar bench conferences that had taken place during the *voir dire* proceedings.

The trial justice, when making what was certainly a discretionary ruling, was aware of not only the severity of the horrendous and vicious acts of alleged violence giving rise to the pending charges against Thornton, but also Thornton's extensive past criminal record, which included convictions for past crimes of violence.[18] Added to that mix also was the trial justice's firsthand observations of Thornton's disruptive conduct and the sarcastic demeanor he displayed during several of the pretrial hearings on various motions that he or his former court-appointed counsel filed.[19] Armed with that background information and being cognizant of the fact that the jury *voir dire* proceedings and the trial would take place in the small Washington County courtroom, it became the trial justice's duty to maintain general order in the courtroom and to minimize any potential danger to himself, the jury, and courtroom personnel and spectators. This Court has long recognized that duty of a trial justice, *State v. Correra*, 430 A.2d 1251, 1256 (R.I. 1981), and his or her "full discretion" to implement any measures reasonably necessary to ensure the safety of the jurors.

**17.** We note that *McKaskle* stops short of establishing a per se rule when it states that such events as Thornton complains of here only "erode" *Faretta* rights. " 'Erode' is not a synonym for 'violate.' Thus, the cases become fact-specific[.]" *United States v. McDermott*, 64 F.3d 1448, 1454 (10th Cir.1995).

**18.** As detailed in the state's brief, the defendant's record included forty-two criminal charges lodged against him since 1981. His record featured charges of larceny, uttering and publishing, cocaine possession, shoplifting, assault with a dangerous weapon, possession of a controlled substance with intent to deliver, domestic assault (both misdemeanor and felony), and possession of a dangerous weapon, among others. He had been violated numerous times, and had gone to trial as well as pled.

**19.** We cite from the state's brief examples of the defendant Thornton's obstreperous and unruly pretrial hearing conduct:

"Prior to trial defendant sometimes exhibited volatile behavior in the courtroom, interrupting the court and making sarcastic or otherwise disrespectful comments. * * * At one point, frustrated that the court refused to appoint counsel to his liking, defendant informed the trial justice that he was going to keep his handcuffs on throughout the trial even in front of the jury. * * * The court warned defendant that this was not defendant's decision to make. * * * At the next pretrial hearing, defendant stated that if the court refused to grant him a continuance and get him another attorney, 'I will request that everything that I don't understand, I be handed a dictionary, [and given] time to look it up * * *.'

"Again the court admonished defendant:

"I want to tell you something about the conduct of the trial that I want you to think about * * * You request a dictionary in front of me or in this Courtroom, or in front of fourteen men and women in that jury box, and you are not getting it. You are not going to do anything, being a non lawyer or whatever, to destroy the judicial process or delay your trial. I'm going to see to that."

At the pretrial hearing on December 2, 1997, immediately prior to the start of trial, the defendant began the hearing by repeatedly interrupting the court so many times that the trial justice ordered him to "follow the rules of protocol in this Court, or you are going to hear your case downstairs in the cell block."

*State v. Lerner,* 112 R.I. 62, 92, 308 A.2d 324, 343 (1973). That duty could permit a defendant to be restrained with handcuffs and/or shackles, if circumstances required such precautions. *State v. Hightower,* 661 A.2d 948, 957 (R.I.1995).

In this case, although vested with the discretionary right to have terminated outright Thornton's self-representation because of his serious and obstructionist misconduct and to have appointed standby counsel to represent Thornton, *Faretta,* 422 U.S. at 834–35 n. 46, 95 S.Ct. at 2541 n. 46, 45 L.Ed.2d at 581 n. 46, the trial justice opted instead to exercise his discretion to impose what he believed to be the most unobtrusive measure to avoid any dangerous disruption of the *voir dire* and trial proceedings by Thornton. He requested only that Thornton be handcuffed if he wanted to personally take part in sidebar bench conferences at which Thornton would be within immediate reach of the trial justice and the trial jury. If Thornton refused to be handcuffed on those occasions, his standby counsel could attend and participate to keep Thornton informed of all that had taken place at the sidebar bench conference. At no other times during the jury *voir dire* or the actual trial was Thornton required to be in handcuffs while representing himself *pro se.* Indeed, the trial justice's decision to conditionally preclude a *pro se* defendant from sidebar conferences is constitutionally protected when there is legitimate con-

cern that he or she might disrupt the court proceedings. "The right of a defendant to attend sidebars is no broader than the right of self-representation itself, which the trial judge may, within an appropriate exercise of discretion, divest or circumscribe." *McKnight v. Albauch,* No. 97 Civ. 7415 WK, 2000 WL 1072351, at *7 (S.D.N.Y. Aug.2, 2000).

In this case, the trial justice permitted Thornton to act as his own attorney in all respects, with the one exception that he could only appear at sidebars handcuffed. This, we believe, was an objectively reasonable, measured response to Thornton's conduct. The trial justice apparently did not believe that restraining Thornton was required during those "other times" in the courtroom because he then was always within arm's length and immediate reach of the two committing squad guards assigned to transport him to and from the Adult Correctional Institutions (ACI), where he was being held. Consequently, Thornton's general assertions that he was precluded *ipso facto* as a *pro se* "lead counsel" from participating in any sidebar bench conferences are simply not accurate.[20] Thornton, as does the dissent, overlooks the undeniable trial record fact that the trial justice specifically had informed Thornton that he could indeed take part in any and all bench conferences, provided that while doing so he be in handcuffs. It was Thornton who con-

---

**20.** We believe that the dissent misconstrues both the December 2, 1997 pretrial hearing record and the state's position regarding the trial justice's restriction concerning the defendant Thornton's participation at *voir dire* sidebar conferences. The hearing record fails to support the dissent's position that "the trial justice flatly barred [Thornton] from attending sidebars for the purpose of jury *voir dire,* but allowed him to attend other sidebars only if he wore handcuffs." The state's brief also flatly contradicts the dissent's hypothecating

that "the state concedes" the exclusion of the defendant at sidebar conferences contention to be accurate.

What is accurate, is the state's clear statement in its appellate brief that because of the defendant Thornton's previous "volatile behavior in the courtroom," the "Court did not categorically preclude defendant's participation, [at the *voir dire* and sidebars]" but ruled that if he were to participate he would have to do so in handcuffs * * *."

sciously rejected that choice afforded him by the trial justice. However critical of the choice afforded him, it was a choice fairly imposed and within the parameters of the discretion vested in the trial justice, and this Court should not lightly second-guess a trial justice's discretion in that regard. "It is too obvious for argument that hardly any other matter can better be relegated to the discretion of the trial court than that of safeguarding the court, counsel, jury, and spectators, and assuring the continued presence and attendance of the accused at the trial." *McDonald v. United States,* 89 F.2d 128, 136 (8th Cir. 1937). *See also State v. Patriarca,* 112 R.I. 14, 308 A.2d 300 (1973).

Thornton's Sixth Amendment right to represent himself as *pro se* counsel, we point out, was not "a license to abuse the dignity of the courtroom." *Faretta,* 422 U.S. at 835 n. 46, 95 S.Ct. at 2541 n. 46, 45 L.Ed.2d at 581 n. 46 (citing *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970)). *See also United States v. Mills,* 895 F.2d 897 (2d Cir.), *cert. denied,* 495 U.S. 951, 110 S.Ct. 2216, 109 L.Ed.2d 541 (1990).

Interestingly, Thornton, below as here, attempts to justify his election not to take part in any bench conferences while handcuffed and thereby also his contention that he was precluded from participating in sidebar bench conferences because he feared that his appearance in handcuffs would prejudice the jury against him. We do not share fully in his fear. This fanciful fear on Thornton's part is somewhat paradoxical. It overlooks his earlier warning to the trial justice that unless he was able to get counsel of his own choice provided to him, he was going to insist upon keeping his handcuffs on throughout the course of the trial in full view of the trial jury.

The mere fact that the jury would have observed Thornton in handcuffs would not,

as he fears, and as the dissent contends, *per se* have prejudiced him. *State v. Bleau,* 649 A.2d 215, 219 (R.I.1994). Indeed, as we previously have noted, "one juror who sees a defendant in handcuffs is as apt to be filled with compassion as another juror who might feel the defendant's guilt has been established." *State v. Palmigiano,* 112 R.I. 348, 358, 309 A.2d 855, 861 (1973). Contrary to the defendant's contentions, it was his burden to prove that he was prejudiced in his absence from sidebar conferences, and he failed to do so on the record before us. *Id.* at 358, 309 A.2d at 861. Clear evidence of that failure can be gleaned from the fact that despite having been made aware of Thornton's incarceration from a transcript of the *voir dire* of Dr. Stewart, which had been admitted without objection as a full trial exhibit, the trial jury acquitted Thornton of several of the more serious felony charges that had been lodged against him.

We additionally note from the trial record the trial justice's conscientious effort to avoid any possible prejudice that might have resulted from Thornton's appearance at any bench conferences while in handcuffs. Following our earlier directions to trial justices who might be faced with a situation in which a defendant's "in custody" status could be interpreted from security measures employed by court sheriffs or committing squad personnel, the trial justice in this case offered on several occasions prior to trial to inform the jury pool in *voir dire,* and later the trial jury, that Thornton was in custody, and to give a cautionary instruction that would alleviate or serve to avoid any prejudice against him that might have resulted. Those offers were rejected by the defendant, who now contends that he refused to appear at bench conferences in handcuffs because

being seen handcuffed by the jury would prejudice him.[21]

Thornton, it appears, was at all times permitted to attend and participate at the bench conferences had he chosen to do so, and his appearance in handcuffs would then have permitted the trial justice to give a cautionary instruction to the jury and to obtain from the jurors their assurance that their verdict would not be based on the fact that Thornton was in custody. This is what was done in *Bleau*, and we found the procedures that the trial justice employed in that case to be free of any error. In providing Thornton with the option of participating in sidebar conferences in handcuffs, we believe that the trial justice struck a reasonable balance between Thornton's interests and the trial justice's duty to maintain an orderly and safe courtroom. *See, e.g., Hightower*, 661 A.2d at 957.

Thornton, in addition, utterly fails to show that his absence from the sidebar conferences substantially interfered with his ability to present his defense or otherwise control his case. Thornton's active role at trial, the trial justice's instructions

about Thornton's acting *pro se*, and Thornton's own repeated references before the jury to his *pro se* status all demonstrate that his absence from sidebar conferences did not cause the jury to conclude that he was not in control of his defense. *See, e.g., McKaskle*, 465 U.S. at 186–87, 104 S.Ct. at 955–56, 79 L.Ed.2d at 138–39; *United States v. McDermott*, 64 F.3d 1448, 1453–54 (10th Cir.1995); *Mills*, 895 F.2d at 905. The trial record discloses that it was Thornton himself who had, on numerous occasions, enlisted the assistance of standby counsel in the presence of the jury during the trial, which certainly served to indicate to the jury that standby counsel participated in sidebar conferences at Thornton's request. *See McDermott*, 64 F.3d at 1454; *Mills*, 895 F.2d at 905.

Thornton also contends here on appeal that the jury might have perceived him to be dangerous based upon his absence from sidebar conferences. That contention never was presented to the trial justice. During trial, he asserted only that he wanted to personally participate in sidebar conferences because he was "lead counsel." His newly raised objection concerning his absence from sidebar conferences was not

21. In *State v. Fenner*, 503 A.2d 518, 522 (R.I. 1986), in which a similar problem existed, this Court said:

"However, as guidance for trial courts in the future, we observe that it should be the obligation of a trial justice to inform counsel in advance if he or she intends to advise prospective jurors or jurors who have been selected to serve on a particular case that the defendant is in custody for the purpose of neutralizing any inference that might otherwise be formed. In the event that counsel objects to such an admonition, he or she has an obligation to inform the trial justice forthwith before the admonitions have been given. In such a situation, the trial justice should forego making such a statement to the jurors, but the defendant assumes the risk that by some inadvertence he or she may be seen in the course of being transported from the ACI to the courthouse or otherwise be seen to be in custody in circumstances of which the court might not be aware and in circumstances where this observation might not be called to the attention of either the court or counsel. In other words, the defendant should have his choice in determining whether this type of instruction should be given, but that choice should be exercised before the admonition is given, not afterward. The defendant, having exercised his choice, is then precluded from asserting as error the fact that the jurors might have seen him in custodial posture outside the courtroom or being transported in the prisoners' van. Of course, if the trial justice becomes aware of such an observation, a cautionary instruction should be given at the defendant's request." *See also State v. Bleau*, 649 A.2d 215, 219 (R.I.1994).

raised below, is therefore waived, and is not now properly before us. *State v. Hazard,* 785 A.2d 1111, 1115 (R.I.2001). We note, however, that given the trial testimony of Debra Means, the state's first trial witness, and Thornton's own admission to the trial jurors in his opening statement and later in his closing argument that he had indeed committed two of the vicious felonious assaults for which he later was convicted, it appears unlikely that the jury would have found him any more dangerous simply because of his absence from sidebar conferences. We also note that during the trial, only *four* bench conferences occurred and that all are noted in the trial transcripts as "off the record." In *Mills,* in which a *pro se* defendant had been prohibited from participating in sidebar bench conferences, "the apparently few instances of exclusion did not constitute 'a substantial violation of [the defendant's] Faretta rights.'" *McDermott,* 64 F.3d at 1453 (quoting *Mills,* 895 F.2d at 904). We point out that Thornton's preclusion from participating in the sidebar bench conferences unless handcuffed did not violate his Sixth Amendment right to represent himself as *pro se* counsel. *See Mills,* 895 F.2d at 905.

We conclude that the trial justice did not abuse his discretion in requiring the defendant to be handcuffed when attending any sidebar bench conferences, and no error resulted from his so ruling.

### (b) Chambers Conferences

We next consider whether the trial justice's refusal to permit Thornton, as a defendant and *pro se* counsel, to participate in six chambers conferences, violated his Fourteenth Amendment due process right to be present at every stage of his trial,[22] or his right to do so provided by our Rule 43 of the Superior Court Rules of Criminal Procedure.[23] We examine his Fourteenth Amendment due process right and his right to be present as enunciated in our Rule 43 in the light of our previous holdings.

In *State v. Souza,* 425 A.2d 893, 901–02 (R.I.), *cert. denied,* 454 U.S. 840, 102 S.Ct. 148, 70 L.Ed.2d 123 (1981), we noted:

" 'So far as the Fourteenth Amendment is concerned, the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.' *Snyder v. Massachusetts,* 291 U.S. 97, 107–08, 54 S.Ct. 330, 333, 78 L.Ed. 674, 679 (1934). To the extent that Rule 43 of the Superior Court Rules of Criminal Procedure grants a broader right of presence than does the Fourteenth Amendment, it too

---

**22.** We do not agree with the dissent's contention that *only* the defendant's Sixth Amendment rights are relevant in our consideration of this appeal. Although his right to represent himself as *pro se* counsel clearly implicates Sixth Amendment considerations, he still remained a defendant in the trial, and as such, his Fourteenth Amendment due process rights were also implicated along with the rights afforded him by our Rule 43 of the Superior Court Rules of Criminal Procedure. In *Faretta,* the Supreme Court clearly noted that:

"The Sixth Amendment includes a compact statement of the rights necessary to a full defense[.] * * * Because these rights

are basic to our adversary system of criminal justice, they are part of the 'due process of law' that is guaranteed by the Fourteenth Amendment to defendants in the criminal courts of the States." *Faretta v. California,* 422 U.S. 806, 818, 95 S.Ct. 2525, 2532, 45 L.Ed.2d 562, 572 (1975).

**23.** Rule 43 provides in pertinent part:

"The defendant shall be present at the arraignment and at the imposition of sentence, except as otherwise provided by these rules. The defendant shall be present at every stage of the trial, including the impaneling of the jury and the return of the verdict * * *."

guarantees substantial as opposed to shadowy or theoretical rights of presence. The rule does not require that a 'defendant has a right to be present at all occurrences after the impaneling of the jury—but only to those occurrences that concern the guilt or innocence of defendant or affect his ability to defend against the charges' in the case. *State v. LaChappelle*, 424 A.2d 1039 (R.I. 1981)."

More recently in *State v. Brouillard*, 745 A.2d 759 (R.I.2000), we again noted:

"Pursuant to the Fourteenth Amendment's Due Process Clause, a defendant's presence at a particular stage of the pretrial proceedings is a condition of due process 'to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.' *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S.Ct. 2658, 2667, 96 L.Ed.2d 631, 647 (1987) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 107–08, 54 S.Ct. 330, 333, 78 L.Ed. 674, 679 (1934)). Although Rule 43 of the Superior Court Rules of Criminal Procedure grants broader rights to a defendant, it, too, only requires the defendant to be present at every stage of the trial that concerns 'the guilt or innocence of defendant or affect[s] his ability to defend against the charges against him.'" *Brouillard*, 745 A.2d at 766–67 (quoting *LaChappelle*, 424 A.2d at 1046).

With the benefit of this Court's previous holdings in *Souza* and *Brouillard* as guidance, we undertake now to inquire about the nature and substance of each of the six chambers conferences to determine whether Thornton's personal absence therefrom "thwarted" his Fourteenth Amendment right to a fair and just hearing, *Souza*, 425 A.2d at 901–02, in short, to ascertain whether at those chambers conferences attended by the state prosecutor and defendant's standby counsel anything constituting a matter of importance took place that affected Thornton's guilt or innocence or affected his ability to defend against the charges made against him.

■ Our review of the record discloses that at each of the chambers conferences in which the state's prosecutor and Thornton's standby counsel participated, nothing transpired that "thwarted" Thornton's right to a fair hearing or affected his ability to defend against the charges made against him. In fact, the first three chambers conferences all were held to accommodate pretrial motions Thornton filed through his standby counsel, and all were resolved in Thornton's favor.

The first of those chambers conferences concerned Thornton's request to be permitted to engage, at state expense, a medical expert in psychiatry to assist Thornton in advancing his alleged diminished capacity defense. The trial justice granted that request, as well as Thornton's request to hire, at state expense, an investigator to assist Thornton in discovering witnesses and evidence that could help Thornton's defense.

The second chambers conference concerned the defense psychiatrist's request for state funds to permit him to perform various medical tests and to set deadlines for those tests to be completed.

The third chambers conference was initiated by the trial justice for the sole purpose of informing the parties that he would permit the defendant's expert witness to testify concerning the results of various tests that had been conducted by other qualified persons at the request of the defendant's expert.

■ The fourth chambers conference was to consider a request by Thornton to be furnished with trial transcripts from all other and previous criminal trials in which

Thornton had been a defendant and in which none of the state's witnesses expected to be called in the pending trial were involved. Such a request, mind-boggling to say the least, properly was denied. Because such transcripts would be inadmissible at Thornton's pending trial, other than to confirm his past vicious conduct and convictions, we are unable to perceive how the defendant's right to a fair and just hearing had in any way been thwarted by Thornton's absence from that chambers conference.

 The fifth chambers conference concerned the trial justice's intention to excuse a prospective juror, who during *voir dire* questioning by the trial justice, had informed the trial justice that he did not believe that he could be an impartial juror in light of the nature of the pending charges against the defendant. Certainly, Thornton was not in any way prejudiced by the trial justice's decision to excuse that juror unless he wants us to believe now that he would have preferred to have an admittedly biased and partial juror, who had concluded Thornton's guilt before trial, to remain as a prospective juror.

 It also should be noted that it was during the jury *voir dire* conducted personally by the trial justice pursuant to Rule 24 of the Superior Court Rules of Criminal Procedure that the trial justice excused the prospective juror from the panel of jurors. It is difficult to imagine, let alone believe, that if the trial justice had not excused the potential juror that the defendant himself would not have done so.[24]

 The sixth chambers conference occurred during the trial. During trial, one of the trial jurors had notified the trial justice through the courtroom's sheriff that he suddenly had realized after listening to the testimony of Dr. Stewart, the defense medical expert, that he was somehow acquainted with Dr. Stewart. The trial justice then questioned the juror in chambers with the state's prosecutor and standby counsel present, and they also were permitted to thoroughly question the juror. All parties present were completely satisfied that the juror could remain impartial. The trial justice determined that the juror, despite his limited knowledge of Dr. Stewart, remained unbiased and impartial and permitted him to remain on the jury. Thornton immediately was advised of what had transpired at the chambers

---

**24.** We have not overlooked Thornton's contention that the trial justice erred in not granting his pretrial motion for an individual *voir dire* of the prospective jury panel. Suffice it for us to note that there is nothing in Rule 24 of the Superior Court Rules of Criminal Procedure nor in G.L.1956 § 9–10–14 that specifically permits or provides for an individual *voir dire*, although in a particular instance in which such a *voir dire* might avoid the possible disqualification of an entire prospective jury panel, an individual *voir dire* may be permitted by the trial justice. *See, e.g., State v. Massey*, 119 R.I. 666, 382 A.2d 801 (1978). In any event, whether to permit an individual *voir dire* is left to the sound discretion of the trial justice.

Rule 24, we further note, permits a trial justice to conduct the *voir dire* examination of the prospective jurors, and allows a *pro se* defendant or counsel for the defendant and the state prosecutor to supplement the *voir dire* examination by further inquiry.

In this case, the trial justice opted to personally conduct the *voir dire*. In so opting, he specifically informed the parties "that I will ask questions of the jury that are called to the box, and I will permit Ms. Lynch, *Mr. Thornton* and/or standby counsel to make further inquiry." (Emphasis added.) Thus, at no time was the defendant prevented from participating in the jury *voir dire* proceedings. He was not handcuffed during the in-court proceedings, and was free to question the prospective jurors. He was required to be handcuffed only if he requested to participate in any sidebar bench conferences.

conference by his standby counsel and at no time voiced any objection to the trial justice's decision permitting the juror to remain on the jury. Even if Thornton had objected and disagreed with the trial justice's decision, exclusion of a trial juror for possible bias is left to the sound discretion of the trial justice. *Hazard,* 785 A.2d at 1122 (citing *State v. McDowell,* 685 A.2d 252, 255 (R.I.1996)).

We are satisfied that there was no abuse of discretion on the part of the trial justice in permitting the juror to remain on the jury panel. We also are satisfied that Thornton's exclusion from the six chambers conferences did not interfere with his Sixth Amendment right to control his *pro se* defense, nor did his absence "thwart" or adversely affect his ability to defend against the various charges made against him in the indictment.

## (c) Restrictions on Movement

Nothing in the trial record suggests any form of limitation that had been placed upon Thornton's ability to address the trial jury in opening and closing statements or to approach and question any of the trial witnesses for purposes of conducting direct or cross-examination or to show them exhibits. As a matter of record, Thornton was not handcuffed during the trial while in the presence of the trial jury.

The record, on the other hand, discloses that Thornton openly requested standby counsel's assistance on repeated occasions. Thus, there is a total absence in the record of any evidence showing that Thornton was somehow impermissibly restrained while the jury was present in the courtroom or to support his claim that his movements during his trial in the courtroom were restricted. *See, e.g., Cronan ex rel. State v. Cronan,* 774 A.2d 866, 878–79 (R.I.2001). We conclude that Thornton fails to show any material interference

with his Sixth Amendment rights in this regard.

## III

## Exclusion of Evidence

In endeavoring to buttress his diminished capacity defense, Thornton attempted to establish at trial that he was so influenced by his prior use of cocaine and alcohol that he was unable on June 18, 1996 to form the specific intent necessary to convict him of the specific-intent crimes for which he had been charged. He vainly attempted during his cross-examination of the state's witnesses to elicit from them evidence of his alleged diminished capacity to demonstrate that his behavior on June 18 was consistent with his being "high" and that he only returned to a coherent state after the effects of drugs and alcohol had dissipated. He also called as a defense witness Capt. Glenn Browning of the Narragansett police department, who witnessed the standoff. The trial justice refused, however, to allow any lay witnesses to speculate about the type of mindset that could have caused Thornton's behavior or when and whether his mindset could have changed during the time he was assaulting Debra and holding her hostage.

Before trial, Thornton himself sought to limit the number of police officers who would be permitted to testify for the prosecution, and the state obligingly pared down its initial trial witness list. During the state's case, Thornton extensively cross-examined Sgt. Joseph Little (Sgt. Little), who, along with Officer Denise Owens (Officer Owens), served as a negotiator with Thornton during the standoff. During the course of the standoff, Sgt. Little had engaged in approximately forty conversations with Thornton through an apartment window and by telephone. Officer Owens, who later arrived at the scene,

assumed the role of lead negotiator, but she and Sgt. Little acted jointly throughout the standoff. Both had equal opportunity to observe Thornton's behavior.

Thornton later attempted to call Officer Owens as a defense witness, explaining that as the primary police negotiator during the standoff, she had "more time to develop [an] opinion" of Thornton's condition than other police witnesses. The state objected based on Sgt. Little's testimony that he and Officer Owens had been together the entire time and had worked jointly; that Officer Owens's testimony simply would be cumulative; and that Officer Owens should not be permitted to offer a lay opinion as to Thornton's state of mind. The trial justice agreed, finding the proposed testimony cumulative, and her lay opinion inadmissible, and therefore sustained the state's objection.

 Both the United States and Rhode Island Constitutions guarantee a criminal defendant the right to confront and cross-examine adverse witnesses and to present defense evidence. U.S. Const. Amends. VI, XIV; R.I. Const. art. 1, sec. 10. However, a defendant has "no constitutional right to introduce irrelevant, immaterial, or prejudicial evidence." *State v. Malone*, 568 A.2d 1378, 1382 (R.I.1990).

It is well-settled that a trial justice may exclude evidence "if its probative value is substantially outweighed by the * * * needless presentation of cumulative evidence." R.I.R.Evid. 403. As with other Rule 403 rulings, this Court reviews determinations of cumulative evidence under the deferential abuse-of-discretion standard. *See, e.g., State v. White*, 512 A.2d 1370, 1373 (R.I.1986).

 In this case, the trial justice did not abuse his discretion in excluding Officer Owens's testimony on the grounds that it would have been cumulative. The trial justice and prosecutor noted that many other witnesses had testified concerning Thornton's demeanor and behavior, including Debra, who spent the fourteen-hour ordeal as Thornton's hostage, and Sgt. Little, who arrived at the scene thirty minutes before Officer Owens and who had later negotiated with Thornton, along with Officer Owens, throughout the standoff.

Thornton made no offer of proof to suggest that Officer Owens's testimony would have added anything materially new or different to assist in his diminished capacity defense nor did he request to *voir dire* Officer Owens outside the jury's presence. Without a proffer or other description about the expected substance of the proposed testimony, the trial justice's decision to reject Officer Owens as a witness cannot be faulted, *State v. Cote*, 691 A.2d 537, 541–42 (R.I.1997), and this Court is unable to conclude any abuse of discretion resulting from the trial justice's ruling. *Hazard*, 785 A.2d at 1120.[25] Also, it does not matter that the testimony already in the record concerning Thornton's appearance and demeanor during the standoff came primarily from prosecution rather than defense witnesses. *See, e.g., State v. Nardolillo*, 698 A.2d 195, 202 (R.I.1997) (holding that excluded defense witness testimony would have been cumulative to testimony already given by prosecution witness).

We observe nothing in the record to suggest that Officer Owens's testimony concerning Thornton's demeanor and be-

---

**25.** Numerous cases have upheld a trial justice's decision to preclude a defendant from eliciting testimony from a witness when the same evidence came in through other witnesses, rendering the proposed testimony cumulative. *See, e.g., State v. D'Agostino*, 691 A.2d 561, 563 (R.I.1997) (per curiam); *State v. Speaks*, 691 A.2d 547, 551 (R.I.1997); *State v. Oliveira*, 576 A.2d 111, 114 (R.I.1990).

havior would have been anything more than cumulative to the testimony of the trial witnesses who preceded her. Accordingly, we discern no error on the part of the trial justice in excluding her testimony.

## IV

### Admission of Previous Misconduct Evidence

Thornton also contends that the trial justice erred when he allowed the prosecutor to cross-examine Dr. Stewart, the defense's expert witness, concerning previous bad acts committed by Thornton. He contends that Rule 404(b) of the Rhode Island Rules of Evidence prohibited such cross-examination.[26] However, Thornton confuses Rule 404(b) with Rules 703 and 705, which relate to the formulation of opinion testimony by expert witnesses.[27] A trial justice's ruling on the admissibility of expert testimony will not be disturbed absent an abuse of discretion. *Gallucci v. Humbyrd*, 709 A.2d 1059, 1064 (R.I.1998) (citing *Frias v. Jurczyk*, 633 A.2d 679, 683 (R.I.1993)).

Thornton misconceives the trial record by arguing that allegations of his prior bad acts did not occur until Dr. Stewart's testimony. In fact, it was Thornton himself who opened the door to the admission of evidence of prior bad acts through his cross-examination of Debra, when, in support of his diminished capacity defense, he brought out that in the past he behaved violently toward her only when he was "high" from alcohol or cocaine use. He brought out from Debra on cross-examination that when she was living with him she feared him when he would get "high" because he "would come back and beat [her] up." Thornton did not object to, nor move to strike, her responses or request a cautionary instruction regarding the evidence.

On redirect examination, the prosecutor followed up on this line of questioning to demonstrate that Thornton did not limit his violent behavior only to times when he was "high." Indeed, Debra testified without objection that Thornton had assaulted her on numerous previous occasions whether or not he was "high." At the close of Debra's testimony, the trial justice out of an abundance of caution gave the jury an unrequested, long Rule 404(b) cautionary instruction, to which Thornton did not object.

We note that the trial evidence elicited from Debra completely served to discredit the opinion testimony of Dr. Stewart. He had testified that Thornton's violent behavior was an aberration and resulted from large amounts of alcohol, cocaine, lack of sleep and food, and the effects of a previous head injury. On cross-examination, Dr. Stewart readily conceded that he had

---

**26.** Rule 404(b) of the Rhode Island Rules of Evidence provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable."

**27.** Rule 703 of the Rhode Island Rules of Evidence provides: "An expert's opinion may be based on a hypothetical question, facts or data perceived by the expert at or before the hearing, or facts or data in evidence. If of a type reasonably and customarily relied upon by experts in the particular field in forming opinions upon the subject, the underlying facts or data shall be admissible without testimony from the primary source."

Rule 705 provides: "Unless the court directs otherwise, before testifying in terms of opinion, an expert witness shall be first examined concerning the facts or data upon which the opinion is based."

relied exclusively on what Thornton had told him in two short interviews to form his expert opinion about the cause of his violent behavior toward Debra on the day of the incident.

Doctor Stewart also conceded that it would have been significant for him to have reviewed Thornton's past history of violent domestic assaults, but that he was mainly unaware of such history because Thornton barely mentioned it. The trial justice permitted the prosecutor to test Dr. Stewart's opinion by inquiring about how much of his opinion about Thornton's abuse of Debra and his criminal behavior could be attributed to Thornton's drug abuse and whether his opinion would change if he knew that Thornton repeatedly had engaged in such violent and criminal conduct whether or not he was "high." The state also was permitted to explore whether Dr. Stewart had considered that Thornton's history of violent, episodic behavior, which the doctor attributed to drugs, alcohol, and other factors, was typical of someone who committed domestic violence.

When Thornton objected to this questioning, the trial justice informed the jury that the purpose of the state's cross-examination was to test the credibility of Dr. Stewart's opinion because that opinion rested entirely on statements Thornton had made to Dr. Stewart. Thornton did not object to the trial justice's instruction.

Just as Thornton's hearsay statements to Dr. Stewart were admissible under Rule 703 because of the doctor's reliance upon them, otherwise inadmissible instances of the defendant's prior bad conduct were admissible to test the basis and validity of the expert witness's opinion. *See, e.g., People v. Henderson*, 794 P.2d 1050, 1054

(Colo.Ct.App.1989) (allowing under Rule 705 the prosecutor to use the defendant's prior bad acts to cross-examine the expert concerning the basis of his opinion), *rev'd on other grounds*, 810 P.2d 1058 (Colo. 1991); *McCloskey v. State*, 457 A.2d 332, 336–37 (Del.1983) (permitting under Rule 703 the introduction of inadmissible facts on cross-examination to test the basis of an expert's opinion); *see also State v. Copas*, 252 Conn. 318, 746 A.2d 761, 768 (2000) (holding that the defendant's otherwise inadmissible hearsay statements may be used to cross-examine the expert to test the basis of the expert's opinion). As part of the state's cross-examination of Dr. Stewart, we are satisfied that it was permissible for the prosecutor to supply omitted facts of Thornton's prior bad acts to determine whether those facts would alter or modify the expert's opinion. *People v. Fields*, 170 Ill.App.3d 1, 120 Ill.Dec. 285, 523 N.E.2d 1196, 1205–06 (1988).

We note that it is generally held that a prosecutor's cross-examination of a mental health expert in a case raising an insanity or diminished capacity defense may properly use the defendant's previous convictions or other prior bad acts to test the expert's proffered opinion and credibility.[28] Such cross-examination was particularly appropriate in this case because the expert witness primarily had predicated his expert opinion on the defendant's prior conduct and history as furnished to the expert by the defendant. *See, e.g., Rogers v. United States*, 483 A.2d 277, 289 (D.C. 1984); *State v. DeGraw*, 196 W.Va. 261, 470 S.E.2d 215, 220–21, 223, 224–25 (1996). The nature of the material on which the expert opinion is based clearly is one of

---

**28.** *United States v. Bradshaw*, 935 F.2d 295, 301–02 (D.C.Cir.1991); *McCloskey v. State*, 457 A.2d 332, 336–37 (Del.1983); *Rogers v. United States*, 483 A.2d 277, 287–90 (D.C.

1984); *Holland v. State*, 636 So.2d 1289, 1293 (Fla.1994); *State v. DeGraw*, 196 W.Va. 261, 470 S.E.2d 215, 220–26 (1996).

the more important features of the expert's testimony. *Rogers*, 483 A.2d at 289.

Notwithstanding that Thornton's prior bad acts were properly admissible under Rules 703 and 705 rather than Rule 404(b), we reiterate our longstanding rule that their admission must still satisfy Rule 403,[29] and, if challenged, their admission is subject to an abuse-of-discretion review. *State v. Garcia*, 743 A.2d 1038, 1050 (R.I. 2000).

On the record before us we conclude that admission of the testimony concerning Thornton's prior bad acts was necessary to the prosecutor's ability to test the validity and credibility of Dr. Stewart's opinion. In asserting his diminished capacity defense, Thornton was asserting that his mental capacity on the day of the incident had been substantially diminished by his use of cocaine and alcohol, and other factors, and was, in effect, a concession of his practical responsibility, rather than culpability. *See State v. Barrett*, 768 A.2d 929, 947 (R.I.2001); *Correra*, 430 A.2d at 1253. Admission of prior misconduct when the state of the defendant's mental health is the primary issue creates less of an opportunity for prejudice than when the defendant denies the commission of the crimes altogether. In this case, Thornton did not contest the underlying facts.[30] Given Thornton's concessions and the trial justice's cautionary jury instruction to eliminate any residual prejudice that might have occurred as a result of the prior bad act evidence, we believe that it is highly

unlikely that the jury would have sufficiently relied upon the prior bad conduct evidence to conclude that Thornton had a propensity to commit the crimes with which he was charged. *United States v. Bradshaw*, 935 F.2d 295, 302 n. 2 (D.C.Cir. 1991); *Rogers*, 483 A.2d at 288.

In that regard, we join with those courts that repeatedly have held that the Rule 403 balancing determination, when applied to prior bad act cross-examination conducted in circumstances such as this case, should come out in favor of admitting such evidence. *See, e.g., Bradshaw*, 935 F.2d at 302; *United States v. Ruster*, 712 F.2d 409, 411–12 (9th Cir.1983); *Henderson*, 794 P.2d at 1054; *Copas*, 746 A.2d at 769; *Rogers*, 483 A.2d at 289–90.

We consistently have refused to permit defendants to manipulate our Rules of Evidence and to "testify" to the jury through the lips of another, often more credible, witness and thereby avoid cross-examination. *State v. Bustamante*, 756 A.2d 758, 764 (R.I.2000); *State v. Harnois*, 638 A.2d 532, 535–36 (R.I.1994). When a defendant exercises his right not to testify at trial, "[h]e may not testify by other means * * *." *Harnois*, 638 A.2d at 535. "The rules of evidence will not be manipulated * * * [in order to] deprive the state of the opportunity of cross-examination." *Id.* at 536. If the state had been prevented from cross-examining Dr. Stewart about the accuracy of the information Thornton had conveyed to him, Thornton would have

---

**29.** Rule 403 of the Rhode Island Rules of Evidence provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

**30.** Regarding the other general-intent crimes not subject to the diminished capacity defense, *see State v. Doyon*, 416 A.2d 130, 134–.37 (R.I.1980), the only charge Thornton completely denied was the first-degree sexual assault of Debra, for which he was acquitted. He admitted to the remaining general-intent crimes (two counts of domestic felony assault and one count of violating the no-contact order).

successfully manipulated our Rules of Evidence in precisely this prohibited manner.

For all of the reasons discussed above, we conclude that the trial justice did not err in permitting the state to present evidence of Thornton's prior bad acts to the jury through the prosecutor's cross-examination of the defense's expert witness in order to test the credibility of the expert witness's testimony and the validity of his opinion.

## V

### Denial of Motion to Reduce Sentence

■■■■ "A motion to reduce sentence under [Super.R.Crim.P.] 35 is basically a plea by a defendant for leniency and, as such, is addressed to the sound discretion of the trial justice." *State v. Tiernan*, 645 A.2d 482, 484 (R.I.1994). The motion "allows [a] trial justice to evaluate whether the sentence originally imposed is unduly severe under the circumstances and to consider any new information or circumstances that may arise * * *." *State v. Bettencourt*, 766 A.2d 391, 393 (R.I.2001) (quoting *State v. Ferrara*, 748 A.2d 246, 248 (R.I.2000) (per curiam)). This Court has held that "only when the record unswervingly points to the conclusion that there is no 'justification' for the imposition of a sentence that is 'grossly disparate from sentences generally imposed for similar offenses' shall we modify or revise a sentence imposed in the exercise of a trial justice's discretion." *State v. Pacheco*, 763 A.2d 971, 983 (R.I.2001) (quoting *State v. Crescenzo*, 114 R.I. 242, 263, 332 A.2d 421, 433 (1975)).

■■■■ In imposing sentence, a trial justice may consider numerous factors, including the severity of the crime; the defendant's personal, educational, and employment background; the defendant's potential for rehabilitation; societal deterrence; and the appropriateness of the punishment. *State v. Mollicone*, 746 A.2d 135, 138 (R.I.2000) (per curiam) (citing *Tiernan*, 645 A.2d at 484). In determining the sentence, the trial justice is bound only by the statutory parameters established by the Legislature. *Bettencourt*, 766 A.2d at 394 (citing *State v. Gordon*, 539 A.2d 528, 530 (R.I.1988)).

■■■■ After reviewing the presentence report, letters from the victim, her family, the chaplain at the ACI, and Thornton's extensive criminal record, and after hearing Thornton's arguments and allocution, the trial justice opted to impose consecutive maximum sentences on each charge for which Thornton had been convicted. The trial justice aptly likened the events of June 18–19, 1996 to a "combat zone" and found that Thornton had to pay for the fourteen hours of repeated brutality that he had inflicted upon Debra.

We are satisfied that the trial justice carefully reviewed the purposes of incarceration and the various factors involved for imposing sentence, noting that Thornton never attempted to take advantage of his "ample opportunities" to resolve the fourteen-hour standoff in a peaceful manner. Rather, he noted that Thornton had placed in danger Debra's life as well as the lives of the police during the fourteen-hour standoff. The record discloses that the trial justice gave careful and proper consideration to the nature and extent of the pain and multiple injuries that were repeatedly inflicted upon Debra during the long standoff, and which he aptly described as being "intolerable."

We note also that in considering Thornton's motion to reduce his sentences the trial justice took into consideration Thornton's extensive criminal record and his dubious potential for rehabilitation that "demonstrated a lack of commitment to rehabilitation and the inclination and ca-

pacity to take [his] place as an honest and useful member of the society." He finally stressed his hope that the sentences imposed would deter others from committing similar crimes and would send a message to others who might be inclined to do so that domestic violence and abuse would not be tolerated and would invoke long sentences for those convicted of doing so.

We discern also no error or abuse of discretion on the part of the trial justice in concluding that the parole board, rather than the court, should assess the quality of Thornton's claimed rehabilitation. *See Mollicone,* 746 A.2d at 138; *State v. Flores,* 637 A.2d 366, 367 (R.I.1994) (per curiam).

Finally, with regard to Thornton's motion to reduce sentence, we see that during the hearing thereon he stressed his alleged remorse for his actions and his good prison conduct. The trial justice apparently detected no salt in Thornton's tears, nor do we, and as to Thornton's claim of being a model prisoner, we simply remind him that "[s]uch a fact is entirely irrelevant to a reexamination of the reasons for the imposition of sentence in the first place" because "we expect nothing less than good behavior as a minimum from inmates of our correctional institutions." *State v. Upham,* 439 A.2d 912, 914 (R.I.1982).

We observe nothing in the record before us to support Thornton's contentions that the trial justice abused his discretion in denying Thornton's Rule 35 motion to reduce his sentences.

## Conclusion

For the reasons above stated, Thornton's appeals are denied and dismissed. His judgments of conviction for two counts of domestic felony assault, violation of a no-contact order, kidnapping, and intimi-

dation of a witness are affirmed. His appeal from the trial justice's decision denying his motion to reduce sentence is denied and dismissed. The papers in this case are remanded to the Superior Court.

Chief Justice WILLIAMS did not participate.

FLANDERS, Justice, dissenting.

I respectfully dissent from the Court's opinion. I believe that the Superior Court violated this *pro se* defendant's Sixth Amendment rights in three specific ways. First, both state and federal precedent required the Superior Court to conduct at least some type of a *Faretta*[31] inquiry with this indigent defendant after it allowed his first attorney to withdraw, appointed another attorney to represent him, and told him it would not entertain a similar motion to remove his second attorney if he could not get along with that lawyer. This error—which resulted in the defendant's representing himself at trial against capital felony charges—cannot be rendered harmless by seizing upon this unrepresented defendant's later admissions and using them to conclude that, notwithstanding the court's error in failing to undertake a *Faretta* inquiry, he must be deemed to have knowingly and intelligently waived his right to counsel. Second, the trial justice violated the defendant's constitutionally protected right to participate in juror *voir dire,* including sidebars during which the court conducted individual juror *voir dire,* by effectively precluding him from being present when this *voir dire* occurred. Third, the trial justice violated the defendant's Sixth Amendment rights when he barred him from participating in various substantive chambers conferences that occurred throughout the trial. In my judgment, these errors constituted significant

31. *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

constitutional violations that require this Court to vacate the defendant's conviction and remand this case for a new trial in the Superior Court.

## I

### Denial of the Right to Counsel

Before trial, defendant repeatedly expressed to the Superior Court his displeasure with his first appointed counsel.[32] After several attempts at reconciliation, this first assigned attorney ultimately acquiesced in defendant's request to have him removed from the case. Although the motion justice reluctantly agreed to allow this attorney to withdraw, she stated: "I am also going to tell you that I am not going to entertain a similar motion again." The defendant replied: "the next attorney that I receive is basically I am stuck with—I don't know—*I don't really understand what you are saying.*" (Emphasis

---

**32.** Although the majority states that defendant "failed to outline his specific concerns regarding [his first appointed counsel's] representation," defendant did advise the hearing justice on October 28, 1996 as follows:

"I just don't feel I am getting properly represented on certain issues of contacts when I called and try to speak with him, lack of interest, when I asked for certain things to be requested through the Courts as to motions that I have asked to have him put in for me. Also—okay? Things I asked for that has not been granted as far as him representing me, okay? And also the previous contacts, he is aware I tried to remove him before but I tried to see if I could—see, work that out and I just come to the conclusion it is not—it is not in my best interest under this type of magnitude that I am under—I don't feel I am going to get properly represented."

And even though, as the majority concludes, defendant may have been a clever, guileful person who dismissed his first appointed counsel for no reason other than to delay his trial, the hearing justice made no such finding that defendant possessed such an intent, nor did she rule that defendant's complaints about his appointed attorney, though vague, were meritless. The motion justice told defendant at the first hearing, "I need specifically what your problem is. You are not being specific at all," and asked him to address whatever concerns he had with his first appointed attorney. At the later hearing on the removal of defendant's first appointed counsel, held on November 25, 1996, defendant specifically explained his reasons for wishing to remove that attorney. Thus, he stated:

"I would like at this time to ask the Court to dismiss my attorney * * * as my Public Defender for the following reasons. I have not been able to see [him] since that time I spoke about releasing him that time up until and I would say forty-eight hours ago. Okay? Also I am never been able to contact [him] since you told us to try to work it out. To me, [he] has failed to keep me abreast of the developments of this case and has not made me aware of any of the defenses that would be offered before the [c]ourt. Another problem is that there is an ongoing difference of opinion between me and [him]. It has affected the attorney/client relationship and the amount of trust that I have for [him]."

Finally, the majority states that at this subsequent hearing on November 25, 1996, the hearing justice "sens[ed] that [defendant] appeared to have initiated a course intended to delay his trial." The hearing justice, however, made no such statement or finding, nor did she intimate that she held this opinion. And even though the majority may "sense" that defendant engaged in delaying tactics when he dismissed his first appointed attorney, I can find no record support for the proposition that the hearing justice shared this view when she excused this attorney. The majority furthers its speculation about the hearing justice's "sense" when it states that "[d]espite her continued suspicion [of defendant's delaying tactics]" (emphasis added) she excused defendant's second appointed attorney. To be sure, at the hearing on September 4, 1997, some nine months after she excused defendant's first appointed attorney, the hearing justice stated that defendant's attempt to remove his second appointed lawyer "on the eve of trial" was not a "coincidence." But attributing a "continued suspicion" to the hearing justice relating back to defendant's motion to dismiss his first appointed attorney enjoys no support in the record.

added.) Without explaining to defendant the significance of her order, which defendant understood to mean that "the next attorney that [I] receive is basically I am stuck with," the motion justice continued the matter until the court could appoint replacement counsel for defendant. It is at this point that applicable United States Supreme Court precedent required the hearing justice to engage in a *Faretta* inquiry with the defendant.[33]

Although the court eventually appointed a second attorney to represent him, defendant also experienced problems with this second attorney that were similar to those he reported having with his first appointed lawyer. Ultimately, defendant filed a disciplinary complaint against the second appointed attorney, thereby creating a conflict of interest that prevented this attorney from continuing as his counsel. A few days before defendant's scheduled trial, at a hearing on removing defendant's second attorney, the motion justice stated as follows:

"I previously allowed you to release [your first lawyer] as attorney in connection with this case. And if you recall when I did that and made the court appointment of [your second lawyer], *I told you that would be your last court appointed lawyer.* * * * So, in effect, I have lowered your options. The trial is established as a date certain for [next] Monday will go forward as scheduled. You can hire your own lawyer privately

to be ready on Monday to go forward with the case, or you can represent yourself at the trial." (Emphasis added.)

The defendant then stated that he was incapable of handling the case himself, and the following exchange occurred:

"COURT: And you will go forward to trial next week.

"DEFENDANT: How?

"COURT: And you can do whatever you want to do to assist yourself.

"DEFENDANT: On trial between now and then? I don't know what I'm supposed to do, Your Honor."

Notwithstanding defendant's professed bewilderment at this turn of events, the court allowed defendant's second attorney to withdraw from the case and ordered defendant to proceed to trial by representing himself as his own attorney (that is, *pro se*). The trial justice, who was not the same justice who handled these pretrial matters, refused at that point to appoint new counsel for defendant, stating "[y]our choices are these, [y]ou appear *pro se*, as you indicated you would do. The court will consider backup counsel for you, or you make your peace with [your second lawyer]."[34] The court then proceeded to trial with the defendant ordered to represent himself *pro se*, albeit with standby counsel appointed by the court.[35]

Because the rights enumerated in the Sixth Amendment are fundamental to the

---

**33.** The majority does not directly respond to this assertion, but includes a long exposition of defendant's later statements after the court had imposed *pro se* status upon him because he was unable to get along with his second appointed lawyer.

**34.** It is clear from the record, however, that defendant did not indicate that he would represent himself at trial, nor did he ever *request* to do so; rather, the court essentially forced him to do so because of his inability to get

along with the two attorneys that the motion justice had appointed to represent him.

**35.** Although the majority asserts that defendant refused his standby counsel's services as trial counsel "apparently intending to be able to later capitalize on what he envisioned could be a built in trial error which, if convicted, could serve to his advantage," the trial justice made no such finding.

adversarial system of criminal justice, they are "part of the 'due process of law' that is guaranteed by the Fourteenth Amendment to defendants in the criminal courts of the States." *Faretta v. California*, 422 U.S. 806, 818, 95 S.Ct. 2525, 2532, 45 L.Ed.2d 562, 572 (1975). In my judgment, the pretrial motion justice violated defendant's Sixth Amendment right to counsel when she "lowered [his] options" and told defendant that the second attorney that she assigned to him would be his last court-appointed lawyer. I reach this conclusion because she did so without also conducting the constitutionally required *Faretta* inquiry into whether defendant's potential waiver of his right to counsel—if he was unable to get along with this second lawyer—was knowing and intelligent.

In 1975, in *Faretta, supra*, the United States Supreme Court ruled that the Sixth Amendment to the United States Constitution guarantees criminal defendants both the right to counsel in criminal cases and the right to self-representation. Before a court can allow a defendant to represent himself or herself *pro se* at trial, however, the defendant must voluntarily, knowingly, and intelligently waive his or her right to representation by an attorney (appointed or retained). In *Faretta* the Court stated that "[a]lthough a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, *he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'*" *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541, 45 L.Ed.2d at 581–82 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268, 275 (1942)). (Emphasis added.)

Here, the trial court never made defendant aware of the "dangers and disadvantages of self-representation" before it "lowered [his] options" and gave him the choice of either going to trial represented by his second court-appointed counsel or proceeding to trial without any lawyer to represent him. It was after the court dismissed defendant's first appointed counsel that the hearing justice should have conducted a *Faretta* inquiry.[36] Instead, the court effectively forced him either to allow his second appointed attorney or standby counsel to represent him at trial or else to represent himself at trial. By refusing to appoint another attorney for him after he was unable to get along with his second appointed attorney, the court held defendant to the *pro se* choice he had made by disqualifying his second lawyer. But neither the motion justice nor the trial justice ever took the time or trouble to make sure that the record established that defendant knew about the dangers and disadvantages of self-representation before he took steps to disqualify his second appointed counsel from representing him. The trial justice's later offer to allow standby counsel to "slide over" did not cure this basic problem because no one made sure that defendant's decision to proceed *pro se* was knowing and intelligent

---

**36.** The majority focuses most of its analysis on defendant's statements *after* the court ruled that defendant would have to proceed *pro se* if he could not get along with his second appointed counsel. But any later statements in which defendant admitted his desperate situation should be irrelevant to the analysis because they did not occur until after defendant "chose" to discharge his appointed attorneys and to proceed *pro se*. By then, his *pro se* status was a fait accompli and he was reduced to pleading with the court to help him undo a choice that was anything but intelligent, informed, and knowledgeable when the court foisted it upon him.

as required by *Faretta*.[37] As a result, we lack a factual basis to know whether defendant's conduct that led to his self-representation at trial was " 'made with eyes open'" to the potential adverse consequences of *pro se* representation. *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541, 45 L.Ed.2d at 581–82.

When a court places a defendant in this position of choosing between proceeding to trial *pro se*, or with appointed counsel that defendant may seek to discharge, other courts have found that a defendant's refusal of appointed counsel's services is tantamount to a voluntary waiver of the right to counsel. *E.g.*, *United States v. Padilla*, 819 F.2d 952, 956 (10th Cir.1987). Thus, in the case at bar, when defendant filed a disciplinary complaint against his second appointed attorney after the court informed him that this would be his "last" appointed lawyer and after he refused to accept the services of standby counsel appointed by the court, he must be deemed to have voluntarily waived his right to counsel. This is so because the court provided defendant with two different court-appointed attorneys, told him that this second attorney would be the last one the court would appoint for him, and offered, though defendant refused, to have standby counsel represent him at trial. The *Faretta* analysis, however, does not end with an inquiry into the voluntariness of the defendant's conduct that resulted in his or her *pro se* status; rather, the trial court still must determine whether defendant knowingly and intelligently waived his right to counsel before he took steps to disqualify

his appointed attorneys and before he refused the services of standby counsel.

In *State v. Spencer*, 783 A.2d 413 (R.I. 2001), this Court recently had the opportunity to pass on whether a defendant's waiver of the right to counsel was voluntary, knowing, and intelligent. In that case, the defendant waived his right to counsel in the middle of his criminal trial and announced that he wished to proceed *pro se*. *Id.* at 415–16. On appeal he argued that, because the trial justice did not conduct the multi-pronged inquiry specified in *State v. Chabot*, 682 A.2d 1377 (R.I.1996), the defendant did not knowingly and intelligently waive his right to counsel. *Spencer*, 783 A.2d at 416. In *Spencer*, however, we held that compliance with the *Chabot* checklist is required only in those situations in which there are legitimate concerns about the defendant's mental condition. *Id.* at 416. Otherwise, the Court ruled, "[w]e are persuaded that an examination of the totality of the circumstances, in light of the particular stage of the proceedings at the time the waiver is proposed, is the better approach to determine whether a waiver of counsel is knowing, voluntary and intelligent." *Id.* at 417.

The state and the majority argue that an examination of the totality of the circumstances in this case, as in *Spencer*, satisfies the second prong of the *Faretta* waiver analysis. To be sure, the record shows that, after defendant made his "choice" to disqualify his "last court-appointed lawyer," he may have come to appreciate (the hard way) at least some of the pitfalls of representing himself at trial. Significantly, however, this evidence arose *after* the

---

**37.** The majority refers to defendant's rejection of three court appointed attorneys. In fact, the court only appointed two attorneys to represent defendant. The defendant *refused* appointment of his standby counsel as his trial counsel. And even though the majority asserts that the trial justice was satisfied "that

Thornton was totally aware of the 'magnitude of the undertaking' of self-representation and, as well, the dangers involved in representing himself at trial," I cannot locate where in the trial transcript the trial justice so stated or made any such findings.

court "lowered [defendant's] options" by telling him it would not appoint another attorney to represent him if he was unable to get along with his second appointed attorney. Importantly, the Court's conclusion in *Spencer* relied upon a colloquy between the trial justice and the defendant *before* the court granted the defendant's request to proceed *pro se.* It did not address a situation like this one in which the court requires the defendant to proceed *pro se* because of his inability to get along with or accept the services of appointed counsel. And in *Spencer,* unlike this case, the Court was "satisfied that the trial justice engaged in a pragmatic inquiry sufficient to satisfy himself that defendant's waiver of counsel was made 'with eyes open.'" *Spencer,* 783 A.2d at 418 (quoting *Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541, 45 L.Ed.2d at 581–82).[38] Unlike the case at bar, the trial justice in *Spencer* engaged in at least some type of "pragmatic inquiry" with the defendant about the inadvisability of the defendant's proceeding *pro se,* including telling him that the court did not believe it was a "good idea," and informing the defendant that the court would hold him to the rules of procedure. Most importantly, this inquiry occurred on the record, before the court allowed the defendant to proceed *pro se.*

Here, however, no such pitfalls-of-self-representation colloquy occurred between defendant and the motion justice. And even though *Spencer* limited the applicability of *Chabot* to defendants with potential mental problems, and concluded that "a *detailed* colloquy between the trial court and the defendant * * * is not constitutionally required," *Spencer,* 783 A.2d at 416 (emphasis added), it is still evident that some type of inquiry or communication between the court and defendant is required to ascertain whether defendant is aware of "the dangers and disadvantages of self-representation," before defendant sets a course leading to *pro se* representation. *Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541, 45 L.Ed.2d at 581–82. Furthermore this inquiry or communication "must sufficiently establish that knowledge and understanding *on the record,*" *Chabot,* 682 A.2d at 1381 (emphasis added), "so that the record will establish that '[the defendant] knows what he [or she] is doing and his [or her] choice is made with eyes open.' *Adams v. United States ex rel. McCann,* 317 U.S. at 279, 63 S.Ct. 236, 87 L.Ed. 268." *Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541, 45 L.Ed.2d at 581–82 (holding that the trial judge must make an inquiry to establish the defendant's knowledge concerning the pitfalls of *pro se* status and that the record must so reflect).[39] I also

---

**38.** The defendant notes, and the state agrees, that a harmless-error analysis is inapplicable to alleged violations of the right-to-counsel clause of the Sixth Amendment. *See Holloway v. Arkansas,* 435 U.S. 475, 489, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426, 437 (1978); see also *State v. Martin,* 608 N.W.2d 445, 453 (Iowa 2000) (collecting cases, including United States Supreme Court cases, which hold that violations of a defendant's Sixth Amendment right to counsel are too fundamental for courts to use a harmless-error analysis, and that the harmless-error doctrine presupposes representation by counsel, a factor that is obviously not present in the *pro se* context). *See Perry v. Leeke,* 488 U.S. 272, 278–80, 109 S.Ct. 594, 599–600, 102 L.Ed.2d 624, 632–33

(1989); see also *State v. Young,* 626 So.2d 655, 657 (Fla.1993).

**39.** For these reasons, I respectfully disagree with the majority's conclusion that "[t]his Court [in *Spencer*] has recently held in a unanimous opinion * * * that a *Faretta* colloquy, while preferable, is not constitutionally required." Moreover, the United States Supreme Court's language in *Faretta* supports the position that the trial justice *must* engage in at least some colloquy or communication with the defendant concerning the pitfalls of proceeding to trial on a *pro se* basis. The Court stated "[the defendant] should be made aware of the dangers and disadvantages of self-representation * * *." *Faretta,* 422 U.S.

do not believe that we can make unjustified assumptions about what defendant's appointed counsel may have told him concerning the dangers of proceeding to trial as a *pro se* defendant. The majority states that "[i]t is reasonable to *assume* that [defendant's] two former attorneys had also discussed with him * * * the benefits of legal representation, including the dangers of proceeding without it." (Emphasis added.) But making such assumptions flies in the face of *Faretta's* clear mandate requiring *record* support for a knowing and intelligent waiver of the right to counsel. To speculate about what defendant's former attorneys may have advised him

at 835, 95 S.Ct. at 2541, 45 L.Ed.2d at 581–82. Clearly, under *Faretta* it is the court that must make the defendant "aware" of the dangers; the trial court cannot rely merely on "the totality of the circumstances." The Supreme Court, in the very next paragraph, proceeds to discuss the colloquy between the court and the defendant that made the defendant "aware" of the dangers of *pro se* status. An expansion of the *State v. Spencer*, 783 A.2d 413 (R.I.2001) holding to rely only on a totality-of-the-circumstances analysis, as the state urges and as the majority concludes, without any type of a colloquy or communication between the court and the defendant as described in *Faretta*, conflicts with binding United States Supreme Court precedent. In my judgment, the *Spencer* decision stands for the proposition that there is no "detailed colloquy" or magic litany of questions that a trial justice must ask a defendant before the defendant may proceed *pro se*. Rather, some sort of an inquiry or communication, together with an examination of the totality of the circumstances, will suffice if the record shows that the defendant knows about the dangers and disadvantages of self-representation when he or she opts for *pro se* status. But *Spencer* does not stand for the proposition that no inquiry at all is necessary to comply with *Faretta*—at least when, as here, we have no equivalent record assurance that defendant was aware of the dangers and disadvantages of self-representation *before* the court required him to proceed to trial on this basis.

and about defendant's possible dilatory motives, presumed knowledge about his *pro se* status, and implicit understanding about the hazards of representing himself against capital felony charges, without any record support for what his discharged lawyers may have informed him, eviscerates defendant's Sixth Amendment rights as guaranteed by *Faretta*, and is precisely the type of hypothetical theorizing that the United States Supreme Court has frowned upon by requiring record support for the right-to-counsel waiver. Moreover, the majority's reliance on the First Circuit case of *Maynard v. Meachum*, 545 F.2d 273 (1st Cir.1976) is misplaced.[40] In sum,

40. Indeed, the First Circuit itself has called into doubt the *Maynard* holding that no colloquy on the record is necessary, stating that "[a]lthough the total circumstances may be looked to in determining waiver, *e.g., Maynard v. Meachum*, 545 F.2d 273, 278 (1 Cir.1976) a trial court cannot rely on isolated bits and pieces of evidence. In *United States v. Lespier*, 558 F.2d, ante, at 630 (1 Cir.1977), we said, '[W]e think it is advisable in all cases presenting an issue of waiver by conduct for the court to address the defendants directly.' *See, also, United States v. Bailey*, 675 F.2d 1292, 1297–1302 (D.C.Cir.1982); *United States v. Welty*, 674 F.2d, ante, at 187–93 (3 Cir.1982); *United States v. Tompkins*, 623 F.2d, ante, at 828 (2 Cir.1980). Although we have indicated that *no set colloquy* is required, see *Maynard v. Meachum*, 545 F.2d, ante, at 277–79 (1 Cir. 1976), and *Fillippini v. Ristaino*, 585 F.2d 1163, 1166 (1 Cir.1978) we nonetheless have consistently maintained that doubts must be resolved in an unrepresented defendant's favor. * * * The court's error was not rendered harmless, as the government argues, by the fact that defendant initially had counsel. Prior representation proves nothing. *E.g., United States v. Welty*, 674 F.2d, ante, 185 (3 Cir.1982)." *United States v. Harlan*, 696 F.2d 5, 7 (1st Cir. 1982). (Emphasis added.)
Thus, even the First Circuit now apparently requires *some* inquiry by the court into defendant's waiver, comporting with the *Faretta* mandate that there be record support for defendant's voluntary, knowing, and intelligent

the "totality of the circumstances" test should not be applied like a giant appellate sponge to soak up and wipe away the trial court's errors in failing to ascertain on the record whether defendant appreciated the significant downside risks of representing himself at trial.

Here, the pretrial motion justice should have conducted a *Faretta*-type inquiry after she released defendant's first attorney from the case, and warned him that the court would not appoint another attorney to represent him if he could not get along with his second attorney. At that point the motion justice should have informed defendant of the inadvisability of proceeding *pro se*, and of the other pitfalls that might accompany such a decision on his part. *Padilla*, 819 F.2d at 959 (suggesting that a trial justice must conduct a *Faretta* inquiry before defendant has fired or refused appointed counsel); *People v. Arguello*, 772 P.2d 87, 97 (Colo.1989) (en banc) (holding "before a reviewing court can find a valid implied waiver based on conduct, there must be ample, unequivocal evidence in the record that the defendant was advised properly in advance of the consequences of his actions"). *See also United States v. Mohawk*, 20 F.3d 1480,

1484 (9th Cir.1994) (holding that the complete lack of a *Faretta* inquiry "is conclusive and requires automatic reversal of a defendant's conviction"). It is at this critical stage of the proceeding—before the defendant has opted to discharge his "last" appointed attorney—that a *Faretta* inquiry would best protect the defendant's Sixth Amendment rights. In short, the court needs to warn a defendant about the disadvantages of *pro se* status *before* he or she takes any action that may have an impact upon his or her constitutional right to counsel.

In this case, the court never warned defendant of the potential adverse consequences to him of having to try his own case *pro se* before he took steps to disqualify his "last" appointed attorney. Any inquiry or communication with defendant that occurred after this point would have been too little and too late to warn him about the pitfalls of self-representation because, having begun the trial as his own attorney with the court refusing to appoint another attorney for him (save for standby counsel), defendant was no longer in a position to act on such warnings. In any event, no such communication occurred.

waiver of counsel. *See, e.g., United States v. Campbell*, 874 F.2d 838, 845 (1st Cir.1989) (stating that the First Circuit "has not interpreted these decisions to mean that the district court must issue a *particular warning or make specific findings of fact* before it allows the defendant to proceed *pro se*,") (quoting *United States v. Hafen*, 726 F.2d 21, 25 (1st Cir.1984)). (Emphasis added.) Indeed, the First Circuit recently issued an opinion which undeniably contradicts the majority's claim that the First Circuit requires no inquiry whatsoever by the trial court. In *United States v. Woodard*, 291 F.3d 95 (1st Cir.2002) the court stated

"[t]he trial judge must *explicitly* make the defendant 'aware of the dangers and disadvantages of self representation, so that the record will establish that he knows what he is doing and his choice is made with eyes

open.' * * * In determining whether there is a competent waiver of the right to counsel, the judge, 'must investigate as long and as thoroughly as the circumstances of the case before him demand.' * * * We are guided by the principle that '[c]ourts must indulge in every reasonable presumption against waiver of the right to counsel.'" *Id.* at *11. (Emphasis added.)

Given the First Circuit's most recent pronouncement on the issue, I do not believe that the majority's no-colloquy-required position can support a waiver of counsel. Although it is clear that the First Circuit requires no specific list of questions that a trial judge must ask of a defendant attempting to waive his or her right to counsel, it is equally clear that the First Circuit requires some sort of inquiry, one that was totally lacking in this case.

Therefore, I believe, to comply with applicable United States Supreme Court precedent, a trial court must conduct some type of a *Faretta* inquiry—in connection with evaluating "the totality of the circumstances"—to assure itself that the defendant is aware of the potential negative aspects of representing himself or herself *before* allowing or forcing a defendant to proceed *pro se. See Mohawk,* 20 F.3d at 1485 (quoting *United States v. Aponte,* 591 F.2d 1247, 1250 (9th Cir.1978), "[t]he manner in which a defendant conducts his defense cannot establish his state of mind at the time he opted for self-representation"). Even relatively knowledgeable defendants should be given some kind of a *Faretta*-type inquiry before the court involuntarily thrusts *pro se* status upon them. *See Mohawk,* 20 F.3d at 1485 (reversal when no transcript of lower court waiver hearing available for appellate review, even though defendant handled his defense "more or less capably," and waiver actually may have been knowing and intelligent); *Gilbert v. Lockhart,* 930 F.2d 1356, 1359 (8th Cir.1991) (reversal when defendant's eight prior felony convictions were insufficient to create inference that he knew of risks of self-representation); *Greene v. United States,* 880 F.2d 1299, 1304 (11th Cir.1989) (waiver invalid when no inquiry into defendant's education, background, experience, or level of legal expertise, even though defendant had substantial experience with criminal justice system); *Berry v. Lockhart,* 873 F.2d 1168, 1170–71 (8th Cir.1989) (waiver invalid when court did not advise defendant of perils of proceeding *pro se* even though defendant had college education, experience with criminal justice system, and did "reasonable job" handling his own case).

It also has been suggested that defendant deftly used his ability to dismiss his court-appointed attorneys as a delaying tactic. But courts that have addressed this precise situation have found that such dilatory antics, while frustrating to the trial judge, are no excuse for dispensing with a *Faretta* inquiry. As the Iowa Supreme Court observed, "[w]hile we sympathize with the frustration and exasperation of the district court, 'even well-founded suspicions of intentional delay and manipulative tactics can provide no substitute for the inquiries necessary to protect a defendant's constitutional rights.'" *State v. Martin,* 608 N.W.2d 445, 450 (Iowa 2000) (quoting *McMahon v. Fulcomer,* 821 F.2d 934, 943 (3d Cir.1987)). *See also State v. Young,* 626 So.2d 655, 657 (Fla.1993) (holding that although judges may presume that abuses of the right to counsel may constitute a request to proceed *pro se,* this presumption *must* be confirmed with a *Faretta* inquiry). Therefore, the trial court's reliance on a belief, however well-founded, that defendant was abusing his Sixth Amendment right to counsel and was seeking to delay the trial by manufacturing problems with his appointed attorneys still does not justify a judicial deep-sixing of the need for a *Faretta* inquiry.

Because the record in this case is devoid of any type of *Faretta* inquiry or communication, I would hold that the Superior Court violated defendant's Sixth Amendment right to counsel by insisting that he proceed to trial without a lawyer and without first ascertaining that he did so knowing about the potential downsides of self-representation. Hence, I would vacate defendant's conviction and remand the case for a new trial.

## II

### Refusing to Allow the *Pro Se* Defendant to Participate in Juror *Voir Dire* at Sidebar Conferences

Besides requiring defendant to represent himself at trial without making sure

he was aware of the dangers of self-representation, the trial justice also prohibited defendant from participating in pretrial sidebar conferences during which the court conducted *voir dire* of individual jurors:

> "I will ask questions of the jury that are called to the box, and I will permit Ms. Lynch [the prosecutor], Mr. Thornton, and/or standby counsel, to make further inquiry. *Those who wish to see the [c]ourt at side bar because of disclosures, or because they feel that they cannot serve as fair and impartial jurors, will be allowed to come to side bar with Ms. Lynch and standby counsel."* (Emphasis added.)

Both defendant and the state acknowledge that the trial justice effectively excluded defendant from participating in these *voir-dire* sidebars.[41] Thus, the state, in its brief to this Court, states that:

> "At the pretrial hearing on December 2, 1997, * * * [t]he court then advised defendant that although defendant as well as standby counsel would be able to question jurors during voir dire as a group, *during individual voir dire at side bar only standby counsel and the prosecutor would be permitted to participate."* (Emphasis added.)

In acknowledging this exclusion, both sides refer to the trial justice's above-quoted ruling distinguishing the procedure for questioning potential jurors "that are called to the box" from "[t]hose [jurors] who wish to see the [c]ourt at side bar because of disclosures, or because they feel

that they cannot serve as fair and impartial jurors." With respect to this latter group, the trial justice ordered, they "will be allowed to come to side bar with Ms. Lynch [the prosecutor] *and standby counsel."* (Emphasis added.) Thus, it appears to me that, as the state concedes, the trial justice flatly barred defendant from attending sidebars for the purpose of jury *voir dire* but allowed him to attend other sidebars only if he wore handcuffs. This conclusion, I submit, is bolstered by the trial justice's further statement to defendant about why his exclusion from the *voir-dire* sidebars would not prejudice him:

> "And that's why, rather than have you in cuffs [*sic*]. And because Mr. Amalfetano is your standby counsel, he's perfectly willing as standby counsel, as he's already assisted you in the rest of these motions and memoranda, to indicate what's going on there, to protect your interests, and reporting back to you. Of course, Mr. Thornton, just so you'll understand the sidebar during the *voir dire* process, during the jury selection process, what is it to you if the Court excuses someone out of our collective decision if that person cannot be fair and impartial to you? How are you being prejudiced in any way?"

In any event, even if the trial justice had not absolutely excluded defendant from *voir-dire* sidebars, defendant would have been faced with the Hobson's choice of attending them in handcuffs, or not at all,[42]

---

**41.** The record shows that defendant argued forcibly for his individual participation in sidebars, a point well preserved in the record. He also has argued this issue to us on appeal. Moreover, defendant's objection to standby counsel participating in *voir-dire* sidebars was not based primarily on his concern over how the jury might perceive these encounters, but rather on his Sixth Amendment right to participate personally in such proceedings.

Thus, I respectfully disagree with the suggestion that defendant waived this issue by failing to raise it at trial.

**42.** Notably, defendant filed a motion *in limine* seeking to prevent the jury from learning of his incarceration, which the trial justice granted. Therefore, requiring defendant to approach sidebar conferences to conduct jury *voir dire* only after armed courtroom officials

as revealed by the following exchange that occurred between defendant and the court:

"DEFENDANT: Also, too, I spoke to advisory counsel, standby counsel, in regard to you having side bars, and I made him aware, and I'll make the Courts [sic] aware, that since I am at this stage lead counsel, not at my own free will, but I would like to participate in anything or any—any conversation that is addressed in this Court for these alleged charges, and also anything that's said at side bar.

"COURT: Well, you will be participating because Mr. Amalfetano [standby counsel] will be providing you with what goes on at side bar.

"DEFENDANT: He made me aware that you prefer to have me in handcuffs. That if I was to stand at side bar, I would have to be in handcuffs.

"COURT: That's correct.

"DEFENDANT: Okay, so the impression, once again, upon the jury, would a side bar take place in front of a jury?

"COURT: That's exactly what side bars do, and that's what is permitted under our rules. And that's why, rather than have you in cuffs [sic]. And because Mr. Amalfetano is your standby counsel, he's perfectly willing as standby counsel, as he's already assisted you in most of these motions and memoranda, to indicate what's going on there, to protect your interests, and reporting back to you.

"Of course Mr. Thornton, just so you'll understand the side bar during the voir dire process, during the jury selection process, what is it to you if the Court excuses someone out of our collective decision if that person cannot be fair and impartial for you? How are you being prejudiced in any way?

"DEFENDANT: I don't know. You know, first of all, once again, I'm a blind man walking. I don't know what's going on. But *I just want to know, you know, let you know that anything you confer on or make your opinions on or whatever, side bar, whatever, I believe that, as an individual, I would prefer to be there to hear everything. Not saying that standby counsel will not advise me, but I just want to participate to the fullest of my individual right of being accused.*

"And that's all I would have to say on that, your Honor. It's going to be your discretion, your decision, I just want you to be aware."[43] (Emphasis added.)

had placed him in handcuffs would have revealed his incarcerated status to the jury and, as a practical matter, rendered nugatory the court's ruling on the motion *in limine.* It also should be noted that the trial justice did not "offer" to inform the jurors of defendant's incarceration; rather, he stated that he *would* so inform them, regardless of defendant's objection, stating "[f]ine. [Objection] [s]o noted. But I'm going to ask the question anyway." The prosecutor later stated "[j]udge, I have one concern, and I just want to address it with the [c]ourt before the jury comes in. I'm concerned with the [c]ourt also addressing the issue of incarceration if Mr. Thornton objects to it." Only at the prosecution's urging did the trial justice ultimately relent and agree to prohibit mentioning defendant's incarceration. But the majority's suggestion that the trial justice was bending over backwards to accommodate defendant's requests is not supported by the record. On the contrary, by forcing defendant to wear handcuffs if he wished to be present at sidebar conferences, by banning him completely from chambers conferences and from sidebars involving juror *voir dire,* and by insisting on informing the jury of defendant's incarceration until the prosecution dissuaded him from doing so, the trial justice was making it as difficult as possible for defendant to serve effectively as his own attorney.

43. Standby counsel's presence and participation at the *voir-dire* sidebars did not occur as a result of defendant's request for standby counsel to do so. As the state concedes, the trial justice prohibited defendant from partici-

In my judgment, the trial justice violated defendant's Sixth Amendment rights by effectively excluding him from participating in sidebars during which the court conducted voir dire of potential jurors. The trial justice did not ameliorate this error by permitting defendant's standby counsel to attend these sidebars. Unfortunately, however, the trial stenographer did not transcribe the proceedings during the *voir dire* of the potential jurors, including bench conferences during which the court questioned individual jurors. But here again, the state concedes in its brief that such sidebars occurred: "[t]he substance of most bench conferences, *including those during individual jury voir dire,* was not laid out on the record." (Emphasis added.) If no such bench conferences involving the *voir dire* of individual jurors had occurred, then the state would have suggested as much in its brief and contended that defendant's arguments on this issue were a moot point. But it did not do so, stating only that "[t]he substance of most bench conferences * * * was not laid out on the record." Thus, I infer from the state's response to defendant's arguments on this issue that such bench conferences indeed occurred and that, as the trial justice ruled before the *voir dire* began, defendant was barred from attending them.

The key United States Supreme Court case dealing with the proper role of standby counsel vis-à-vis *pro se* defendants is *McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). In that case, the defendant argued that standby counsel interfered with his ability to present his case and thus violated his Sixth Amendment right to counsel. In analyzing the appropriate roles for standby counsel and *pro se* defendants, the Court enumerated specific rights that attach to a defendant's right to proceed to trial *pro se.* The Court stated "[a] defendant's right to self-representation plainly encompasses certain specific rights to have his voice heard. The *pro se* defendant *must* be allowed to control the organization and content of his own defense, to make motions, to argue points of law, *to participate in voir dire,* to question witnesses, and to address the court and the jury at appropriate points in the trial." *Id.* at 174, 104 S.Ct. at 949, 79 L.Ed.2d at 131. (Emphases added.)

Given the clear statement of the United States Supreme Court on this question, I believe the trial justice erred by excluding defendant from sidebars during which the court conducted individual *voir dire* of jurors, and thereby violated defendant's Sixth Amendment right to counsel. The teaching of *McKaskle* is binding on us, and that case accords to *pro se* defendants the right to participate in the *voir dire* of potential jurors—at least requiring them to be present when it occurs. A disagreement with the substance of this ruling is not now, nor has it ever been, a proper justification for ignoring its mandate—one which we, of course, are bound to follow. Although the perception of the jury may

---

pating at all in *voir-dire* sidebars, and therefore defendant had no choice but to have standby counsel participate on his behalf. Moreover, the majority states that "[n]otwithstanding his [defendant's] affirmative request for the assistance of standby counsel during his trial * * * " defendant asserts violations of his constitutional rights. In fact, the record discloses that the court appointed standby counsel *over* defendant's objection. The defendant stated "I don't wish to proceed *pro se*

or with standby counsel, but I guess I must *under protest* * * *." (Emphasis added.) The trial justice responded that, over defendant's objection, "[t]his case is going forward with you representing yourself. We'll appoint backup counsel off the list." Thus, defendant did not affirmatively request the assistance of standby counsel at his trial; rather, the court insisted on it after defendant could not get along with his appointed attorneys.

have been *one* of defendant's concerns about the court's allowing only standby counsel to be present during the *voir-dire* sidebars, it is clear from the record that defendant attempted to assert his individual right to participate personally in the court's voir dire of potential jurors. Participating in *voir dire* does not mean being told after the fact—at the conclusion of the inquiries and responses that defendant was unable to hear—what decisions the court has made concerning the juror in question.

It is also irrelevant for purposes of this analysis that the trial justice allowed defendant's standby counsel to participate in *voir-dire* sidebars. The *McKaskle* rights, enumerated above, unequivocally grant a *pro se* defendant the personal right to participate in *voir dire*—at least by being present to hear the questions and answers and to request any desired supplementation and follow-up inquiries to the court. Otherwise, how can the *pro se* defendant intelligently exercise his or her right to challenge for cause or to excuse the juror peremptorily?[44] Moreover, the trial justice seemed to believe that, as long as he allowed standby counsel to participate in juror *voir dire*, he had the discretion to

exclude the *pro se* defendant unless his decision to do so prejudiced defendant in some way. I believe, however, that the trial justice committed error in this respect.

First, as noted above, harmless-error analysis does not apply to Sixth Amendment right-to-counsel-clause violations. *See* note 8, *supra.* Thus, defendant need not show that his effective exclusion from the *voir-dire* sidebars prejudiced him, but merely that the trial justice did exclude him. Second, the United States Supreme Court in *McKaskle* has declared that a *pro se* defendant has a right to "participate in voir dire;" hence, this right must include, at the very least, attending the sidebar conferences at which any individual juror *voir dire* occurs. Therefore, the majority's position that the trial court's exclusion of defendant from sidebar conferences involving *voir dire* of individual jurors required a showing of prejudice, and that no reversible error occurred unless the jury perceived that defendant lacked control over his own defense, is at odds with the Supreme Court's explicit pronouncements on this subject. Only such personal partic-

---

**44.** Both *Faretta* and *McKaskle* support this conclusion. *See also United States Time Corp. v. Ann & Hope Factory Outlet, Inc.*, 98 R.I. 503, 513, 205 A.2d 125, 131 (1964) (holding that "[i]n [these] area[s] [relating to the federal constitution and acts of Congress] the decisions of the United States Supreme Court are binding on us."). The Sixth Amendment right to proceed to trial *pro se* is a personal right. The *McKaskle* Court noted that:

"*Faretta's* holding was based on the long standing recognition of a right of self-representation * * *. Under that Amendment [the Sixth Amendment], it is the accused, not counsel, who must be 'informed of the nature and cause of the accusation,' who has the right to confront witnesses, and who must be accorded 'compulsory process for obtaining witnesses in his favor.' The Counsel Clause itself, which permits the accused 'to have the Assistance of Counsel

for his defence,' implies a right in the defendant to conduct his own defense, with *assistance* at what, after all, is his, not counsel's trial." *McKaskle v. Wiggins*, 465 U.S. 168, 174, 104 S.Ct. 944, 949, 79 L.Ed.2d 122, 130–31 (1984).

Thus, a criminal defendant has a personal and individual right to represent himself at trial. The United States Supreme Court has specifically included *voir dire* as a stage of the trial at which a *pro se* defendant has the right to participate. Thus, the defendant's participation in *voir dire* (and all the other enumerated stages of the trial) must be personal participation, or else the right to proceed *pro se* is illusory; that is, a trial justice would be able to order standby counsel to perform other essential trial tasks (e.g., questioning witnesses, arguing to the jury, etc.) for the *pro se* defendant, thus destroying the right to proceed *pro se* at all.

ipation in *voir dire* will allow the pro se defendant to suggest additional questions, to argue to the court about whether to keep or exclude particular jurors, and to exercise peremptory challenges based on what the *pro se* defendant has observed and heard. As the United States Supreme Court has stated, if a court permits stand-by counsel to "speak *instead* of the defendant on any matter of importance, the *Faretta* right is eroded." *McKaskle,* 465 U.S. at 178, 104 S.Ct. at 951, 79 L.Ed.2d at 133. Although not every sidebar conference will constitute a "matter of importance" requiring defendant's presence, others (such as those in which juror *voir dire* occurs) certainly will. Therefore, the trial justice should have been more flexible concerning the options available to maintain courtroom security, yet still protect defendant's constitutional right to have his own voice heard as a *pro se* defendant.[45]

Here again, the majority characterizes defendant's absence from *voir-dire* sidebars as a product of his own choice. But, the majority's "choice" analysis is irrelevant to the case before us, because the state *concedes* that the trial justice absolutely prohibited defendant from participating in the *voir-dire* sidebars. Thus, defendant never had a choice in the matter. Second, even if the trial justice had presented defendant with such a choice, it would have been a Hobson's choice. To

---

**45.** The United States Supreme Court has held that a court may not usually force a defendant to appear in court in shackles. *McKaskle,* 465 U.S. at 178, 104 S.Ct. at 951, 79 L.Ed.2d at 133 (citing *Estelle v. Williams,* 425 U.S. 501, 504–05, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126, 131 (1976)). The state argues that the trial justice's concerns were well-founded in this case because of defendant's "obstreperous" behavior. It should be noted, however, that this "obstreperous" behavior, as the state phrased it, was limited to "interrupting the court and making sarcastic or otherwise disrespectful comments." As an example, the state points to parts of the transcript where defendant "threatened" to request a dictionary to decipher "everything that I don't understand." The record is devoid of any evidence, however, that defendant presented an imminent security threat to courtroom personnel. Indeed, he was not handcuffed or restrained at counsel table. The trial justice could have addressed any underlying security concerns in less restrictive ways that did not stigmatize the defendant as a dangerous criminal by forcing him to don handcuffs in front of the jury as a condition of participating in *voir-dire* sidebars of individual jurors. For example, if there were guards who stood behind him at the counsel table during the trial, why could they not accompany him to the sidebar conferences? In fact, the state cites several cases in which court officers were assigned to accompany defendants to sidebar conferences without resorting to handcuffs. *See People v. Briggs,* 285 A.D.2d 651, 728 N.Y.S.2d 763, 765 (N.Y.App.Div.2001); *People v. Vargas,* 88 N.Y.2d 363, 645 N.Y.S.2d 759, 668 N.E.2d 879, 885 (1996). Although the majority asserts that the trial justice "impose[d] what he believed to be the most unobtrusive measure to avoid any dangerous disruption of *voir dire* * * *," there is no record support for such an assertion. Moreover, why did any individual *voir dire* have to occur when the rest of the jury was still present in the courtroom? At oral argument the state contended that the particular courtroom where this trial took place was one of the smallest in the state, that it had an exit door directly behind the bench, and that, therefore, the trial justice's security concerns were justified. Even assuming these circumstances were accurate (they do not appear in the record), I do not believe that they can justify violating defendant's Sixth Amendment rights. The alleged inadequacy of the state's facilities to allow for a defendant to exercise his or her constitutional rights cannot excuse the state's denial of such rights. For this Court to endorse such a position impermissibly would render constitutional rights dependent upon whether or not the state possesses or provides facilities that are adequate to allow for defendants to exercise such rights. Such a position is untenable. Moreover, the absence of any requirement for the placement of handcuffs on defendant while he was sitting at the counsel table belies the necessity for such a requirement during sidebar conferences.

appear at sidebar in handcuffs would have negated the trial justice's ruling on defendant's motion *in limine* to prevent the jury from learning of his incarcerated status. Finally, as noted above, the majority errs in concluding that defendant bore the burden of demonstrating prejudice flowing from his exclusion from the *voir-dire* sidebars. *See* note 8, supra. Thus, the majority's reliance on *State v. Bleau,* 649 A.2d 215 (R.I.1994) is misplaced. *Bleau* involved jurors accidentally spotting a handcuffed defendant in the hallway of the courthouse, but not, as here, a deliberate forced display of a handcuffed defendant pursuant to a trial justice's ruling that he must present himself in this fashion in open court. Although an accidental sighting of a handcuffed defendant in the hallways of the courtroom might not constitute a *per se* reversible error, a court-ordered requirement that a defendant be present in handcuffs at sidebar conferences in front of the jury is a horse of a different color. In the latter situation, the court itself is forcing the defendant to show the jury that he is in custody if he wishes to exercise a valid constitutional right by participating in the *voir dire* of jurors, whereas the *Bleau* situation simply involved an accidental sighting of a handcuffed defendant, which was subject to the usual harmless-error analysis.

Here, defendant's exclusion from the *voir-dire* sidebars alone is sufficient to require reversal. By effectively barring defendant from attending sidebars at which the court conducted *voir dire* of individual jurors, the trial justice violated defendant's

Sixth Amendment right to counsel. Hence, the Court should vacate his conviction and remand the case for a new trial.

## III

### Exclusion of the *Pro Se* Defendant from Substantive Chambers Conferences

Finally, the trial justice excluded defendant from all chambers conferences. The state not only has acknowledged that the trial justice so excluded defendant, but also it has referred to a sixth chambers conference (the defense cited only five) from which the trial justice excluded defendant. These conferences included occasions when the attendees and the court (1) discussed the appointment of an expert witness (a psychiatrist) that defendant requested; (2) discussed the defense expert's request for money to conduct medical tests, and setting a deadline for the completion of the testing; (3) notified standby counsel and the prosecutor of the court's intention to deny defendant's *pro se* motion for transcripts of other proceedings against him; (4) excused a juror because the juror did not think he could be impartial; [46] (5) informed standby counsel and the prosecutor that the court intended to allow defendant's expert witness to testify; and (6) interviewed a juror who belatedly realized that he knew an expert witness who had testified. Although standby counsel and the prosecutor were present with the trial justice during all these chambers conferences, the court flat-out barred defendant from attending them.[47]

---

**46.** This telling exchange occurred during the chambers conference between the court and standby counsel after questioning of the juror:

"MR. AMALFATANO: Knowing that if I brought this to my client, he would have an absolute objection to this gentleman to continue to sit. I mean, I would naturally go out and discuss it with him, but—

"COURT: No. I think we've gone far enough. [to juror] You are excused."

**47.** The state asserts on appeal that, because the trial justice told defendant after the fact about the results of these conferences, and that most of the rulings favored him, the trial justice did not violate defendant's rights. But

As the state correctly points out, some of these chambers conferences involved mere housekeeping matters. Others, however, involved critical issues to defendant's case, including potential juror bias. These latter conferences, including those dealing with potential juror bias, were certainly "matters of importance" upon which the *pro se* defendant had the right to have his voice heard before the court ruled on whether the juror should or should not be excused. *See generally McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). He also had the right to hear and to observe the juror's responses, so that he could intelligently argue to the trial justice about how he should deal with this particular juror. The trial justice even prevented standby counsel at one of these hearings from consulting with his "client" before the trial justice decided whether a juror's alleged bias prevented the juror from remaining on the jury. *See* note 16, *supra.*

The majority has reframed defendant's assertion that the trial justice violated his Sixth Amendment right to counsel by excluding him from chambers conferences as a Fourteenth Amendment due-process argument. But nowhere in his argument concerning the disputed chambers conferences does defendant allude to his due-process rights. His only contention is that such exclusion violated his Sixth Amendment right to counsel, as that right is guaranteed to him through the Fourteenth Amendment. Therefore, while the majority's Fourteenth Amendment due-process analysis may be accurate with respect to whether a defendant who is represented by counsel can be excluded from chambers conferences, it is *irrelevant* to the case

before us, and does not at all address defendant's actual argument. Moreover, even if the majority's Fourteenth Amendment analysis were on point to this case, it misconstrues defendant's role in the proceedings below. The defendant was not simply a criminal defendant who was represented by counsel. Rather, he was acting *pro se* as his own attorney, with all the rights, privileges and responsibilities that come with that role. The majority apparently discerns no significance in this fact, and treats defendant and standby counsel—who was *not* defendant's attorney—as interchangeable entities, essentially viewing standby · counsel as able to represent defendant's interests to the same extent as if he were defendant's retained or appointed counsel. But such a view is completely unfounded, and is explicitly contradicted by controlling United States Supreme Court precedent. *See McKaskle* and *Faretta, supra.* The defendant was entitled, as discussed below, to be present as his own attorney at these chambers conferences—not to vindicate his Fourteenth Amendment right to a fair and just hearing—but to exercise his Sixth Amendment right to counsel. For this reason, the majority's reliance on the *State v. Souza,* 425 A.2d 893 (R.I.1981) and *State v. Brouillard,* 745 A.2d 759 (R.I.2000) cases is misplaced because, in those cases, the defendants' attorneys were present for the chambers' conferences; thus, they do not address the right of *pro se* defendants to represent themselves at all critical stages of the trial.

The exclusion of a *pro se* defendant from substantive chambers conferences such as these impairs his or her Sixth Amendment

---

a *pro se* defendant possesses the right to participate in such substantive conferences with the court, "to argue points of law * * * and address the court and the jury at appropriate points in the trial." *McKaskle,* 465 U.S. at

174, 104 S.Ct. at 949, 79 L.Ed.2d at 131. Moreover, regardless of the merits of the state's argument, it appears that no one ever made defendant aware of either the final chambers conference or its outcome.

rights as set out in *McKaskle*. Here, however, the analysis is slightly different because standby counsel's participation and defendant's exclusion occurred outside the presence of the jury. When standby counsel's participation occurs outside the presence of the jury, only the first prong of the *McKaskle* analysis is implicated. The Court in *McKaskle* stated that *"Faretta* rights are adequately vindicated in proceedings outside the presence of the jury if the *pro se* defendant is allowed to address the court freely on his own behalf and if disagreements between counsel and the pro se defendant are resolved in the defendant's favor whenever the matter is one that would normally be left to the discretion of counsel." *McKaskle*, 465 U.S. at 179, 104 S.Ct. at 951, 79 L.Ed.2d at 134. But *Faretta* never contemplated the absolute exclusion of the *pro se* defendant from participation in substantive trial proceedings that occur outside the presence of the jury. Rather, the import of *McKaskle* on matters occurring outside the jury's presence is not that the *pro se* defendant may be excluded, but that standby counsel may speak more freely in arguing points to the trial justice, even over the objection of the *pro se* defendant. In fact, the Supreme Court in *McKaskle* has specifically and unambiguously stated that the *pro se* defendant *must* have the opportunity to address the court on "matters of importance"—freely, on his own behalf, outside the presence of the jury.

The state acknowledges that the *pro se* defendant's exclusion in this case from substantive chambers conferences—especially those involving potential juror bias—was problematic. But it mischaracterizes the import of the *McKaskle* decision on this issue. Because the trial justice's rulings were resolved in favor of the *pro se* defendant and because the court later informed defendant of the decisions it had already reached at the conferences from which it excluded defendant, the state maintains that the trial justice did not violate defendant's Sixth Amendment rights.[48] This argument, however, confuses two separate issues. *McKaskle* focuses on the trial justice's resolution of differences between standby counsel's position and the *pro se* defendant's position on issues. But it does not turn on whether the trial justice's ruling on the substantive issue was or was not in defendant's favor. As noted above, *McKaskle* contemplates that the *pro se* defendant will participate in substantive chambers conferences, and that the court will resolve any disagreements that occur at these conferences between the *pro se* defendant and standby counsel in favor of the defendant, so that defendant can maintain control over his own defense.

Here, the trial justice's complete exclusion of defendant from all the substantive chambers conferences during this trial meant that defendant never had the opportunity to address the court during those conferences, when he could best argue points of law and other "matters of importance" to the trial justice before the court

---

**48.** In addition, the majority suggests, as does the state, that the outcome of these conferences in some way must guide our analysis. The majority argues that many of the issues were housekeeping matters, or matters that were wholly subject to the discretion of the trial justice. Although this may be true, the argument misses the mark. Standby counsel and a *pro se* defendant are not interchangeable, and standby counsel cannot replace, at the trial justice's discretion, the *pro se* litigant. The defendant, as his own attorney, has the constitutional right to participate *in person* at these conferences *before* the trial justice reaches any decision on the matters discussed during the conference. The outcome of that decision—for or against the defendant—is irrelevant to the exercise of his Sixth Amendment right to be heard as his own counsel.

decided the issue.[49] Moreover, on at least one occasion (one of the potentially biased-juror conferences), standby counsel suggested that the trial justice should allow him to confer with the *pro se* defendant before the trial justice ruled on whether to exclude an allegedly biased juror. But the trial justice ignored this suggestion and excused the juror anyway, all without receiving any input from the *pro se* defendant. Thus, the trial justice had made his decision and dismissed the juror before he even heard from defendant.

*McKaskle* contemplates active participation by the *pro se* defendant in his case, so that he or she has the right to address the court freely, before the court rules on important motions and issues in the case. Outside the presence of the jury, standby counsel may take a more active approach to his or her unsolicited participation, and that is certainly appropriate. Contrary to the majority's opinion, *McKaskle* does not suggest that the trial court may substitute standby counsel at will for the *pro se* defendant whenever trial conferences and proceedings occur outside the jury's presence. Nothing in *McKaskle* supports the wholesale exclusion of pro se defendants from substantive chambers conferences (or from participation in other proceedings of substantive importance during the trial). Indeed, just the opposite is true.

*McKaskle* indisputably contemplates the active participation of the *pro se* defendant in substantive trial proceedings that occur outside the presence of the jury. It also allows standby counsel, however, to partic-

ipate in a more active manner when the jury is not present because standby counsel's participation will not harm the jury's perception that the *pro se* defendant is managing the trial of his own case. Moreover, "[t]he right to appear *pro se* exists to affirm the dignity and autonomy of the accused and to allow the presentation of what may, at least occasionally, be the accused's best possible defense." *McKaskle*, 465 U.S. at 176–77, 104 S.Ct. at 950, 79 L.Ed.2d at 132. The exclusion of defendant from substantive chambers conferences undercuts the defendant's "dignity and autonomy" that *McKaskle* seeks to protect. By excluding defendant from these substantive chambers conferences, I believe, the court violated defendant's Sixth Amendment rights. Accordingly, I would vacate the defendant's conviction and remand the case for a new trial.

### Conclusion

Although the defendant argued vociferously against it, he must be deemed to have voluntarily chosen to proceed *pro se* because of his firing and removal of the two attorneys that the Superior Court appointed to represent him and his declination of the court's offer to have standby counsel "slide over" and represent him during the trial. But even though the defendant must be deemed to have voluntarily waived his right to counsel, controlling Sixth Amendment law governing the fundamental right to counsel required the motion justice to conduct a *Faretta*-type inquiry into whether the defendant know-

---

**49.** The state points out that *after* the chambers conferences (and after the trial justice had made his decision on whatever issues were raised during these conferences), the trial justice allowed defendant to address the court in the courtroom. In my judgment, this was insufficient to protect the defendant's *McKaskle* rights because, by then, the results of the conference were a *fait accompli* and

defendant's absence put him at a disadvantage because he was unable to hear and respond to the various arguments and positions taken by the participants in the conference. Moreover, defendant refers to at least one chambers conference that no one ever informed him took place, much less its outcome.

ingly and intelligently understood the dangers of representing himself before disqualifying his second appointed attorney. The trial justice's later offer to have stand-by counsel "slide over" and represent the defendant at trial did not cure this constitutional deficiency. Because no such inquiry occurred, I conclude that the Superior Court violated the defendant's Sixth Amendment rights. In addition, the trial justice's effective exclusion of the defendant from participating in sidebars during which the court conducted voir dire of individual jurors and from substantive chambers conferences during the trial also violated the defendant's Sixth Amendment rights as enumerated by the United States Supreme Court in *McKaskle.* For these reasons, the trial justice prevented this *pro se* defendant, at important stages of the proceedings (the juror-*voir-dire* sidebars and substantive chambers conferences), from having his voice heard, contrary to the teachings of *McKaskle.* Moreover, it is also possible that the trial justice's exclusion of the defendant from the juror-*voir-dire* sidebars tainted the jury's perception and led them to believe that stand-by counsel, and not the *pro se* defendant, was in charge of his defense. Again, the appropriate remedy for these significant constitutional violations would be for this Court to vacate the defendant's conviction and remand the case for a new trial. For these reasons, I do not join in the Court's resolution of the other issues raised in this appeal, including those described in parts III through V of the Court's opinion, because I would not reach these questions.